**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| RICARDO R. GARCIA, DUANE K. GLOVER, | ) | |
| PAUL E. JACOBSON, GAETANO CALISE, | ) | |
| MYKHAYLO I. HOLOVATYUK, BRIAN | ) | Case No.: 1:19-cv-00331-LO-MSN |
| GARCIA, PAUL THOMSON and DAVID | ) | |
| HARTMAN on behalf of themselves and all | ) | JURY TRIAL DEMANDED |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VOLKSWAGEN GROUP OF AMERICA, INC. | ) | |
| a/k/a AUDI OF AMERICA, INC., | ) | |
| VOLKSWAGEN AKTIENGESELLSCHAFF, | ) | |
| and AUDI AKTIENGESELLSCHAFF, | ) | |
| | ) | |
| Defendants. | ) | |

---

## AMENDED CLASS ACTION COMPLAINT

---

Michael J. Melkersen
The Law Offices of Michael J. Melkersen, P.C.
9633 S. Congress Street
New Market, Virginia 22844
Telephone: 540.740.3937
 Facsimile:  540.740.8851
E-mail: mike@mlawpc.com

Nathan D. Finch
Kevin R.  Dean (*Admitted Pro Hac Vice*)
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Telephone: 843.216.9000
Facsimile:  843.216.9440
E-mail: kdean@motleyrice.com

*Attorneys for the Plaintiffs and for the
Proposed Nationwide Class and State Classes*

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................... 5

PARTIES ................................................................................................................................... 8

   A.  Individual and Representative Plaintiffs ....................................................................... 8

   B.  Defendants ................................................................................................................ 13

AGENCY ................................................................................................................................ 15

SUBJECT MATTER JURISDICTION ...................................................................................... 16

PERSONAL JURISDICTION ................................................................................................... 16

   A.  VW America ............................................................................................................... 16

   B.  VW Germany ............................................................................................................. 16

   C.  Audi AG ..................................................................................................................... 18

VENUE ................................................................................................................................... 20

COMMON FACTUAL ALLEGATIONS ..................................................................................... 20

   A.  Federal Standards & Certification Requirements ....................................................... 20

   B.  Pre-Production Cars .................................................................................................. 22

   C.  Press-Fleet Cars ....................................................................................................... 26

   D.  Leased-Fleet Cars ..................................................................................................... 29

   E.  The Odometer Fraud ................................................................................................. 30

   F.  Volkswagen's Certified Pre-Owned Program ............................................................ 35

   G.  The Carfax Con-Job .................................................................................................. 38

   H.  Skyrocketing CPO Sales Leads to More Fraud ......................................................... 43

   I.  The Sneaky Recall ..................................................................................................... 46

   J.  Tolling of the Statute of Limitations ........................................................................... 50

CLASS ACTION ALLEGATIONS ............................................................................................ 51

   A.  Class Vehicles Defined .............................................................................................. 51

   B.  Nationwide Class ....................................................................................................... 51

   C.  California State Class ................................................................................................. 51

   D.  Colorado State Class ................................................................................................. 52

   E.  Florida State Class ..................................................................................................... 52

   F.  Illinois State Class ...................................................................................................... 52

   G.  New Jersey State Class .............................................................................................. 52

   H.  Washington State Class ............................................................................................. 52

   I.  Numerosity and Ascertainability ................................................................................ 53

J. Typicality ............................................................................................................. 53

K. Predominance of Common Questions .................................................................. 54

L. Superiority ........................................................................................................... 55

CLAIMS FOR RELIEF ......................................................................................................... 56

FEDERAL CLAIMS ............................................................................................................. 56

COUNT I:  Violations of the Federal Odometer Act ............................................... 56

COMMON LAW CLAIMS ................................................................................................... 60

COUNT I:  Fraud ...................................................................................................... 60

COUNT II:  Breach of Contract ............................................................................... 64

COUNT III:  Unjust Enrichment .............................................................................. 70

STATE LAW CLAIMS ......................................................................................................... 71

CALIFORNIA .................................................................................................................... 71

COUNT I:  Violations of the California Legal Remedies Act .................................... 71

COUNT II:  Breach of the Implied Warranty of Merchantability ........................... 75

COLORADO ...................................................................................................................... 82

COUNT I:  Violations of the Colorado Consumer Protection Act ........................... 82

COUNT II:  Breach of the Implied Warranty of Merchantibility ............................ 86

COUNT III:  Breach of Express Warranty ............................................................... 88

FLORIDA .......................................................................................................................... 93

COUNT I:  Violations of the Florida Deceptive and Unfair Trade Practices Act ...... 93

COUNT II:  Breach of the Implied Warranty of Merchantability ........................... 97

COUNT III:  Breach of Express Warranty ............................................................... 99

ILLINOIS ........................................................................................................................ 103

COUNT I:  Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ............... 103

COUNT II:  Breach of the Implied Warranty of Merchantibility .......................... 107

COUNT III:  Breach of Express Warranty ............................................................. 109

NEW JERSEY .................................................................................................................. 114

COUNT I:  Violations of the New Jersey Consumer Fraud Act ............................. 114

COUNT II:  Breach of the Implied Warranty of Merchantibility .......................... 118

COUNT III:  Breach of Express Warranty ............................................................. 119

WASHINGTON ............................................................................................................... 124

COUNT I:  Violations of the Washington Consumer Protectiion Act ................... 124

COUNT II:  Breach of the Implied Warranty of Merchantability ......................... 128

COUNT III:  Breach of Express Warranty ............................................................................ 129

PRAYER FOR RELIEF............................................................................................................. 134

DEMAND FOR JURY TRIAL.................................................................................................... 135

## CLASS ACTION COMPLAINT

Plaintiffs Ricardo R. Garcia, Duane K. Glover, Paul E. Jacobson, Gaetano Celise, Mykhaylo I. Holovatyuk, Brian Garcia, Paul Thomson and David Hartman (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class" as defined hereinafter), bring this action against Volkswagen Group of America, Inc. a/k/a Audi of America, Inc. ("VWGOA" or "VW America"), Volkswagen Aktiengesellschaft ("VWAG" or "VW Germany"), and Audi Aktiengesellschaft ("Audi AG") and allege, based upon information and belief, the investigation of counsel, and personal knowledge of the individual Plaintiffs as to the allegations pertaining to themselves, the following:

## INTRODUCTION

1.  This lawsuit concerns a scheme by VW America, VW Germany and Audi AG (collectively "Volkswagen" or "Defendants") to yet again defraud its consumers by illegally titling, marketing and selling so-called "certified pre-owned" ("CPO") vehicles to unsuspecting customers who would have never otherwise purchased these cars or who would have paid less for such vehicles had the truth been known. Specifically, Volkswagen misrepresented the certification, prior use and mileage of these vehicles to induce the fraudulent sale of these CPO cars in three interrelated ways.

2.  First, from June 1, 2011 through the present, Volkswagen sold certain Audi-branded and Volkswagen-branded CPO-designated vehicles commonly known as pre-series, zero series or pre-production cars ("Pre-Production Cars") by falsely representing to consumers that such vehicles conformed to all Federal Motor Vehicle Safety Standards ("Federal Safety Standards"), when in fact, Volkswagen knew that these Pre-Production Cars violated Federal Safety Standards and could not be legally sold in the United States.  These illegally

sold Pre-Production Cars comprise the first portion of the Class Vehicles (defined below) for which this lawsuit is brought, which shall be referred to hereinafter as the Pre-Production Class Vehicles.

3.     Second, from June 1, 2011 through the present, Volkswagen sold certain Audi-branded and Volkswagen-branded corporate fleet vehicles ("Corporate Fleet Cars") without disclosing that these CPO-designated cars had been regularly driven for testing and evaluation by members of the automotive press ("Press-Fleet Cars") before these same vehicles were advertised and resold to unsuspecting consumers. Volkswagen misleadingly marketed these Corporate Fleet Cars as "CARFAX 1-Owner" vehicles purportedly entitled to a price premium in the marketplace as a result of such "1-Owner" status. Press-Fleet Cars, however, are significantly less valuable than similarly situated vehicles that have not been test-driven by a myriad of persons within the automotive press. Therefore, by misrepresenting the history of its Corporate Fleet Cars, Volkswagen was able to sell Press-Fleet Cars that it would not have been able to otherwise sell at a price it would not have been otherwise able to obtain. These illegally sold Press-Fleet Cars comprise the second portion of the Class Vehicles (defined below) for which this lawsuit is brought, which shall be referred to hereinafter as the Press-Fleet Class Vehicles.

4.     Third, from June 1, 2011 to the present, Volkswagen sold certain Audi-branded and Volkswagen-branded vehicles without disclosing that these CPO-designated cars had been assigned to a pool of vehicles (the "Pool-Fleet Cars") that were loaned for personal use by employees within VWGOA prior to being leased to a particular employee (the "Leased-Fleet Cars"). These Leased-Fleet Cars were then advertised and resold to unsuspecting consumers. Volkswagen misleadingly sold these Leased-Fleet Cars as "CARFAX 1-

Owner" vehicles purportedly entitled to a price premium in the marketplace as a result of such "1-Owner" status, even though Volkswagen knew that such Leased-Fleet Cars had been driven by a myriad of other individuals prior to being resold to consumers for more than those cars were otherwise worth had the true history of the Leased-Fleet Cars been disclosed.  These illegally sold Leased-Fleet Cars comprise the third portion of the Class Vehicles (defined below) for which this lawsuit is brought, which shall be referred to hereinafter as the Leased-Fleet Class Vehicles.

5.      To cover its tracks of its fraudulent sale of the Pre-Production Class Vehicles, the Press-Fleet Class Vehicles, and the Leased-Fleet Class Vehicles (collectively the "Class Vehicles"), Volkswagen misrepresented the mileage of the Class Vehicles as of the date that it applied for and obtained the original title to those vehicles. Specifically, Volkswagen falsely represented to unsuspecting consumers that the Class Vehicles had only been driven 10 miles at the time those cars were originally titled, when in fact, the Class Vehicles had been driven thousands of miles as of the date when Volkswagen first applied for and obtained the original title (hereinafter the "Odometer Fraud").

6.      It is a common characteristic of Pre-Production Cars, Press-Fleet Cars and Pool-Fleet Cars to have been driven a substantial number of miles during the first eight months of the calendar year when those cars are first introduced to the market.  This is generally not true of cars of the same series and model year that are properly certified to be sold to the public, given that these cars are not typically released for sale until the Fall.  For example, the 2019 Passat would generally not be released for sale to the public until September or October of 2018, but it would not be uncommon for the Pre-Production version of the 2019 Passat to be released for use as a Press-Fleet Car in February or March of 2018.  Given the foregoing,

if Volkswagen had disclosed that a newly-introduced vehicle was driven extensively prior to the Fall of the release year, Volkswagen would have necessarily revealed that vehicle to be a Pre-Production Car.  Because Volkswagen knew that it was and is illegal to sell Pre-Production Cars to the public, Volkswagen lied about when the mileage on the Class Vehicles occurred. Volkswagen furthered this deception by then falsely declaring these cars to be of the highest quality to justify the "Certified Pre-Owned" designation, even though the Class Vehicles were not CPO eligible. Volkswagen then provided the Plaintiffs and the Class members with a falsified Carfax Report that inaccurately identified the Class Vehicles as "1-Owner" cars and that concealed the abuse to which the Class Vehicles were subjected prior to being offered for resale.

7.      Volkswagen's plan worked insofar as Volkswagen tricked the Plaintiffs and the Class members to purchase the Class Vehicles at a premium price well above what those vehicles were worth on the date of the sale. The Pre-Production Class Vehicles are now known to be essentially worthless given that those cars are not properly certified to federal safety standards, cannot be legally driven and cannot be legally sold.

8.      Plaintiffs bring this action individually and on behalf of all the other purchasers of the Class Vehicles to recover the damage caused by Volkswagen's illegal and fraudulent sale of the Class Vehicles, as well as for injunctive relief, equitable relief, punitive damages, and attorneys' fees and costs.

## **PARTIES**

### **A.  Individual and Representative Plaintiffs**

9.      Ricardo R. Garcia ("R. Garcia") is a resident of the State of Washington who, on February 6, 2016, purchased a 2015 Volkswagen Golf R, VIN#WVWLF7AU2FW135993 (the

"Golf") from Volkswagen, by and through its authorized dealer and agent, Auburn Volkswagen, located in Auburn, Washington, which was represented to be a Certified Pre-Owned vehicle. The Golf is a Pre-Production Car and Press-Fleet Car.  Neither the status of the Golf as a Pre-Production Car, nor as a Press-Fleet Car were disclosed to R. Garcia prior to his purchase and was not known by R. Garcia at the time of his purchase.  Instead, Volkswagen actively concealed from R. Garcia the fact that the Golf was a Pre-Production Car and a Press-Fleet Car. Volkswagen further engaged in the Odometer Fraud when selling the Golf to R. Garcia.  As a Pre-Production Car, the Golf does not conform with Federal Safety Standards as represented. The legality of the Golf, its conformance with Federal Safety Standards, and its ownership history were important to R. Garcia, as these factors would be to any consumer, which R. Garcia relied upon in purchasing the Golf. Had R. Garcia been aware that the Golf was one of the Class Vehicles, he would not have purchased it.  R. Garcia continues to own the Golf.

10.     Duane K. Glover ("Glover") is a resident of the State of New Jersey who, on May 17, 2014, purchased a 2013 Volkswagen Tiguan, VIN#WVGBU7AX1DW558422 (the "Tiguan") from Volkswagen, by and through its authorized dealer and agent, Princeton Audi Volkswagen, located in Princeton, New Jersey, which was represented to be a Certified Pre-Owned vehicle. The Tiguan is a Pre-Production Car.  The status of the Tiguan as a Pre-Production Car was not disclosed to Glover prior to his purchase and was not known by Glover at the time of his purchase. Instead, Volkswagen actively concealed from Glover the status of the Tiguan as a Pre-Production Car.  As a Pre-Production Car, the Tiguan does not conform with Federal Safety Standards as represented. The legality of the Tiguan, its conformance with Federal Safety Standards, and its ownership history were important to

Glover, as these factors would be to any consumer, which Glover relied upon in purchasing the Tiguan. Had Glover been aware that the Tiguan was one of the Class Vehicles, he would not have purchased it.  Glover continues to own the Tiguan.

11.     Paul E. Jacobson ("Jacobson") is a resident of the State of Colorado who, on March 11, 2016, purchased a 2015 Volkswagen CC R-Line, VIN#WVWAP7AN6FE817987 (the "CC R-Line") from Volkswagen, by and through its authorized dealer and agent, Dublin Volkswagen, located in Dublin, California, as a Certified Pre-Owned vehicle.  The CC R-Line is a Pre-Production Car and Press-Fleet Car.  Neither the status of the CC R-Line as a Pre-Production Car nor as a Press-Fleet Car were disclosed to Jacobson prior to his purchase and was not known by Jacobson at the time of his purchase.  Instead, Volkswagen actively concealed from Jacobson the fact that the CC R-Line was a Pre-Production Car and a Press-Fleet Car. Volkswagen further engaged in the Odometer Fraud when selling the CC R-Line to Jacobson. As a Pre-Production Car, the CC R-Line does not conform with Federal Safety Standards as represented. The legality of the CC R-Line, its conformance with Federal Safety Standards, and its ownership history were important to Jacobson, as these factors would be to any consumer, which Jacobson relied upon in purchasing the CC R-Line. Had Jacobson been aware that the CC R-Line was one of the Class Vehicles, he would not have purchased it.  Jacobson continues to own the CC R-Line.

12.     Gaetano Calise ("Calise") is a resident of the State of Illinois who, on August 18, 2017, purchased a 2013 Volkswagen CC VR6 4-Motion, VIN#WVWGU7AN3DE556558 (the "CC VR6") from a private individual located in Illinois.  The CC VR6 is a Pre-Production Car.  On information and belief, the CC VR6 is also a Press-Fleet Car.  The status of the

CC VR6 as a Pre-Production Car and Press-Fleet Car was not disclosed to Calise prior to his purchase and was not known by Calise at the time of his purchase. Instead, Volkswagen actively concealed the fact that the CC VR6 was a Pre-Production Car and Press-Fleet Car. As a Pre-Production Car, the CC VR6 does not conform with Federal Safety Standards as represented. The legality of the CC VR6, its conformance with Federal Safety Standards, and its ownership history were important to Calise, as these factors would be to any consumer, which Calise relied upon in purchasing the CC VR6. Had Calise been aware that the CC-VR6 was one of the Class Vehicles, he would not have purchased it.  Calise continues to own the CC VR6.

13.   Mykhaylo I. Holovatyuk ("Holovatyuk") is a resident of the State of Florida who, on February 23, 2013, purchased a 2013 Volkswagen CC Sport, VIN#WVWBN7AN3DE507979 (the "CC Sport") from Volkswagen, by and through its authorized dealer and agent, Volkswagen of Orange Park, located in Jacksonville, Florida, which was represented to be a Certified Pre-Owned vehicle. On information and belief, the CC Sport is a Pre-Production Car, and therefore, does not conform with Federal Safety Standards as represented. The legality of the CC Sport and its conformance with Federal Safety Standards were important to Holovatyuk, as these factors would be to any consumer, which Holovatyuk relied upon in purchasing the CC Sport. Had Holovatyuk been aware that the CC Sport was one of the Class Vehicles, Holovatyuk would not have purchased it. Holovatyuk continues to own the CC Sport.

14.   Brian Garcia ("B. Garcia") is a resident of the State of Florida who, on December 15, 2017, purchased a 2017 Volkswagen GTI, VIN#3VW4T7AU7HM001719 (the "GTI") from Volkswagen, by and through its authorized dealer and agent, Gunther Motor Company,

located in Ft. Lauderdale, Florida, as a Certified Pre-Owned vehicle.   On information and belief, the GTI is a Press-Fleet Car and/or a Pool-Fleet Car. On information and belief, Volkswagen engaged in the Odometer Fraud when selling the Golf to B. Garcia. The ownership history and purported one-owner status of the GTI were important to B. Garcia, as these factors would be to any consumer, which B. Garcia relied upon in purchasing the GTI. Had B. Garcia been aware that the GTI was one of the Class Vehicles he would not have purchased it.  B. Garcia continues to own the GTI.

15.     Paul Thomson ("Thomson") is a resident of the State of California who, on June 12, 2017, purchased a 2017 Volkswagen Golf Sportwagen 4-Motion, VIN#3VW017AU4HM500479 ("the Golf) from Volkswagen, by and through its authorized dealer and agent, Pasadena Volkswagen, located in Pasadena, California, which was represented to be a Certified Pre-Owned vehicle.  On information and belief, Volkswagen engaged in the Odometer Fraud when selling the Golf to Thomson. The ownership history of the Golf was important to Thomson, as it would be to any consumer, which Thomson relied upon in purchasing the Golf. Had Thomson been aware that the Golf was one of the Class Vehicles, he would not have purchased it.  Thomson continues to own the Golf.

16.     David R. Hartman ("Hartman") is a resident of the State of California who, on June 12, 2018, purchased a 2014 Touareg TDI Lux, VIN#WVGEP9BP1ED001525 ("the Touareg") from Volkswagen, by and through its authorized dealer and agent, Netfin Volkswagen, located in Westlake Village, California, which was represented to be a Certified Pre-Owned vehicle.  The Touareg is a Pre-Production Car.  As a Pre-Production Car, the Touareg does not conform with Federal Safety Standards as represented. The legality of the Touareg, its conformance with Federal Safety Standards, and its ownership history

were important to Hartman, as these factors would be to any consumer, which Hartman relied upon in purchasing the Touareg. Had Hartman been aware that the Touareg was one of the Class Vehicles he would not have purchased it.  Hartman continues to own the Touareg.

## B.  Defendants

17.   Volkswagen Group of America, Inc., a/k/a Audi of America, Inc. ("VWGOA" or "VW America") is a corporation organized under the laws of the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171. VWGOA is a wholly-owned subsidiary of Volkswagen Aktiengesellschaft. VWGOA has appointed Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond, Virginia 23219, as its Virginia registered agent for service of process.

18.   Volkswagen Aktiengesellschaft ("VWAG" or "VW Germany") is a German corporation with its principal place of business in Wolfsburg, Germany. VWAG is the parent company of VWGOA.  Volkswagen AG designs, develops, manufacturers, and sells automobiles. VW Germany may be served with process in accordance with The Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention").

19.   Audi Aktiengesellschaft ("Audi AG") is a German corporation with its principal place of business in Ingolstadt, Germany. Audi AG is a wholly-owned subsidiary of VW Germany. Audi AG designs, develops, manufacturers, and sells automobiles. Audi AG may be served with process in accordance with the Hague Convention.

20.   VW America, VW Germany and Audi AG operate a joint venture (the "Joint Venture") whereby those parties agreed to assist each other in designing, manufacturing, importing,

distributing, marketing and selling certain motor vehicles in the United States, including the Class Vehicles at-issue in this case.  At the critical stages in the foregoing activities, VWGOA, VWAG and Audi AG acted as the agent for the other in pursuing their common goal of selling Volkswagen-branded and Audi-branded automobiles in the United States, including the Class Vehicles.  At all relevant times herein, VWGOA, VWAG and Audi AG each maintained a voice in the control and management of this Joint Venture, and each shared in the profits and losses of the enterprise.  The Joint Venture arose in Virginia and is centered in Virginia, and therefore, Virginia law controls the rights and liabilities of the Joint Venture vis-à-vis third parties. Under Virginia law, the Joint Venture is treated as a partnership, and under applicable Virginia partnership law, each partner is jointly and severally liable for the tortious acts of the partnership committed in furtherance of the enterprise. Va. Code § 50-73.96.  Given the foregoing, VWGOA, VWAG and Audi AG are jointly and severally liable for tortious acts of each other, including those acts set forth herein relating to the Class Vehicles.  The term "Volkswagen" as used herein refers to both the Joint Venture and collectively to VWGOA, VWAG and Audi AG.

21.    VW America and non-party VW Credit, Inc., a/k/a Audi Financial Services ("VW Credit") also operate a joint venture (the "CPO Joint Venture") with respect to the specific management and sale of CPO Cars, pursuant to a so-called Risk Sharing Agreement.  At all relevant times herein, VWGOA and VW Credit each maintained a voice in the control and management of the CPO Joint Venture, and each shared in the profits and losses of the CPO Joint Venture. The CPO Joint Venture arose in Virginia and is centered in Virginia, and therefore, Virginia law controls the rights and liabilities of the CPO Joint Venture vis-à-vis third parties. Under Virginia law, the CPO Joint Venture is treated as a partnership,

and under applicable Virginia partnership law, each partner is jointly and severally liable for the tortious acts of the partnership committed in furtherance of the enterprise. Va. Code § 50-73.96.  Given the foregoing, VWGOA is liable for tortious acts of non-party VW Credit, including those acts set forth herein relating to the Class Vehicles, to the extent committed by VW Credit in the course and scope of the CPO Joint Venture.

## AGENCY

22.     At all relevant times herein, VWGOA, VWAG and Audi AG acted as the agents of each other, and all misrepresentations at-issue in this lawsuit and described below in more detail were made with knowledge and intent by VWGOA, VWAG and Audi AG that the misrepresentations would be repeated to third-parties, like Plaintiffs and the Class, and that such third-parties would rely on them.

23.     VWGOA utilized VW Credit, Inc. a/k/a Audi Financial Services as its agent in performing acts relating to the management, titling, marketing and sale of Pre-Production Cars, Press-Fleet Cars, Pool-Fleet Cars, Leased-Fleet Cars, Corporate-Fleet Cars and the Class Vehicles.  All misrepresentations at-issue in this lawsuit, whether stated directly by VWGOA or through its agent VW Credit, were made with knowledge and intent by VWGOA that the misrepresentations would be repeated to third-parties, like Plaintiffs and the Class, and that such third-parties would rely on them. References hereinafter to VWGOA or to VW America should be construed to mean and include actions taken by non-party VW Credit while acting in an agency capacity on behalf of Volkswagen Group of America, Inc., and/or actions taken by VW Credit that were otherwise in furtherance of the CPO Joint Venture.

## SUBJECT MATTER JURISDICTION

24.   This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because there are more than 100 Class members, at least one Class member is of diverse citizenship from at least one defendant (e.g. Plaintiff R. Garcia is a citizen of the state of Washington; Plaintiff Jacobson is a citizen of the state of Colorado; no defendant is a citizen of either of those states), and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. This Court further maintains jurisdiction pursuant to 28 U.S.C. § 1331, given that Plaintiffs bring a claim for the Defendants' alleged violation of a federal statute, namely, the Federal Odometer Act, 49 U.S.C. §§ 32701, *et seq.* This Court also maintains supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

## PERSONAL JURISDICTION

### A. VW America

25.   Personal jurisdiction over VW America in Virginia is proper because it is a corporate citizen of Virginia, having registered to do business with the Virginia State Corporation Commission, and maintaining its principle place of business in Fairfax County, Virginia.

### B. VW Germany

26.   Personal jurisdiction over VW Germany in Virginia is proper because VWAG acted both directly and indirectly to (a) transact business in Virginia; (b) supply services or things in Virginia; (c) cause tortious injury by an act or omission in Virginia; (d) cause tortious injury in Virginia by an act or omission outside Virginia; and (e) regularly does or solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods used or consumed or services rendered in Virginia. *See* Va. Code Ann. 8.01-328.1.

This includes all sales of the Volkswagen-branded Class Vehicles-the majority of which were manufactured by VW Germany and shipped to the United States whereupon title was transferred to VWGOA in Virginia by virtue of a manufacturer's certificate of origin issued by VWAG.

27.     The fraudulent scheme to illegally sell Pre-Production Cars in the United States by and through VWGOA in Virginia was originated by VWAG in Germany and included directives to VWGOA to retrofit Pre-Production and Press-Series Cars that VWAG knew could not be legally sold in the United States and to integrate those illegal cars into the marketplace by and through VWGOA and the CPO Joint Venture in Virginia. These illegal Pre-Production Cars were shipped into the United States from manufacturing plants all around the world controlled by VWAG including Germany, Mexico and Chattanooga, but ownership of these cars, including the Class Vehicles, always passed through VWGOA in Virginia. Once the Volkswagen-branded Class Vehicles had arrived in the United States, VWAG provided oversight, strategy and financial support for the marketing and sales of those illegal vehicles, by and through VWGOA at its headquarters in Herndon, Virginia.

28.     VWAG was also responsible for attempting to mislead the National Highway Transportation Safety Administration ("NHTSA") by virtue of the filing on May 16, 2018 by VWGOA of the so-called Part 573 Safety Recall Report (the "Recall Report") with the NHTSA. The Recall Report, including amendments, was formulated in Virginia though a joint effort between VWGOA and VWAG. In the Recall Report and at VWAG's direction, VWGOA falsely claimed that there were only 252 Pre-Production Cars (the "Recalled Vehicles") that had been illegally sold in the United States. Despite knowing of the illegality of the Class Vehicles all along, and despite senior executives within VW

Germany having been provided a report as early as August 2016 that identified the Class Vehicles as having been illegally sold in the United States (*see* discussion *supra*), VW Germany directed VWGOA to delay the filing the Recall Report for almost two years while its Product Safety Committee within VWAG attempted to figure out some way to avoid disclosure that it illegally sold any of the Class Vehicles.   When the Recall Report ultimately was filed with the NHTSA, it was done for the purpose of misleading regulators and U.S. consumers, including the Plaintiffs and Class members, in an attempt by Volkswagen to hide the breadth of its misconduct in connection with the fraudulent and otherwise illegal sale of the Class Vehicles.   Given these direct and ongoing contacts between VWAG and VWGOA in Virginia regarding the specific activity that forms a portion of the basis for the claims asserted in this lawsuit, personal jurisdiction over VWAG in Virginia is proper.

29.     Personal jurisdiction over VW Germany in Virginia is also proper because the Virginia contacts of VW America and Audi AG concerning the fraud that forms the basis of this lawsuit can be imputed to VW Germany pursuant to the agency relationship that exists between and among the parties, as well as from the fact that all the Defendants conspired to commit the fraud and other illegal acts described in this lawsuit, and also by virtue of the Joint Venture.   For all the foregoing reasons, personal jurisdiction over VWAG in Virginia is proper.

## C.  Audi AG

30.     Personal jurisdiction over Audi AG in Virginia is proper because Audi AG acted both directly and indirectly to (a) transact business in Virginia; (b) supply services or things in Virginia; (c) cause tortious injury by an act or omission in Virginia; and (d) cause tortious

injury in Virginia by an act or omission outside Virginia and regularly does or solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods used or consumed or services rendered in Virginia. *See* Va. Code Ann. 8.01-328.1. This includes all sales of the Audi-branded Class Vehicles all of which were manufactured by Audi AG and shipped to the United States whereupon title was transferred to VWGOA in Virginia by virtue of a manufacturer's certificate of origin issued by Audi AG.

31.     Personal jurisdiction over Audi AG is also proper because of Audi AG executives have engaged in direct and extensive contacts with the state of Virginia concerning the fraud that forms the basis of this lawsuit. For example, Susan Romberg, Director of Sales North America for Audi AG, and Andreas Dietz, Sales Manager USA for Audi AG, personally visited VW America's Herndon, Virginia headquarters for meetings in furtherance of the sales of the Class Vehicles.  Both Romberg and Dietz also have regularly interacted with VWGOA management in Virginia to develop and to direct strategy to increase sales of Audi-branded vehicles, which has included efforts to market Audi-branded and CPO-designated cars of which the Class Vehicles are a part.

32.     Personal jurisdiction over Audi AG in Virginia is also proper because the Virginia contacts of VW America and VW Germany concerning the fraud that forms the basis of this lawsuit can be imputed to Audi AG pursuant to the agency relationship that exists between and among the parties, as well as from the fact that all the Defendants conspired to commit the fraud and other illegal acts described in this lawsuit, and also by virtue of the Joint Venture. For all the foregoing reasons, personal jurisdiction over Audi AG in Virginia is proper.

## VENUE

33.   Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Specifically, Volkswagen directed and controlled the acts that give rise to the allegations set forth in this lawsuit from VWGOA's headquarters in Herndon, Virginia.  To give just a few examples: (a) all the Class Vehicles were imported by VWGOA from its Herndon, Virginia, headquarters before being originally titled; (b) how the Class Vehicles were used was determined by VWGOA from its Herndon, Virginia headquarters until such time as being sold to the Plaintiffs or the Class Members; (c) registration of the Class Vehicles, by and through false applications for title, was overseen and paid for by VWGOA from its Herndon, Virginia headquarters; (d) management of the Press-Fleet Cars occurred predominantly out of VWGOA's headquarters in Herndon, Virginia (i.e. VWGOA's Press Fleet Coordinator works out of VWGOA's Herndon office); (e) prior to the time when the Class Vehicles were sold to Class Members, including Plaintiffs, the repairs and maintenance of the Class Vehicles was overseen, directed and paid for by VWGOA from its Herndon, Virginia headquarters; and (f) the CPO program is managed predominantly out of VWGOA's headquarters in Herndon, Virginia (e.g. both the Audi & Volkswagen Certified Pre-Owned Managers work out of VWGOA's Herndon office).

## COMMON FACTUAL ALLEGATIONS

### A.  Federal Standards & Certification Requirements

34.   Congress passed the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act") with the express purpose of "reduc[ing] traffic accidents and deaths and injuries to persons resulting from traffic accidents." Pub. L. No. 89–563, 80 Stat. 718 (codified at 49

U.S.C. §§ 30101–30183). Toward this end, Congress directed the Secretary of Transportation to prescribe safety standards for motor vehicles, *see* 49 U.S.C. § 30111(a), a statutory duty the Secretary delegates to National Highway Transportation Safety Administration ("NHTSA"). *See* 49 C.F.R. § 501.2. NHTSA's standards ("FMVSS" or "Federal Safety Standards") serve as mandatory performance benchmarks for motor vehicles and their constituent parts. *See* 49 U.S.C. § 30112(a)(1). As such, manufacturers must certify that the vehicles they produce comply with each standard that applies. *See id.* § 30115. Manufacturers must communicate this certification to consumers by including a label on each vehicle that specifically states, in pertinent part, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." 49 C.F.R. § 567.4(g)(5) ("Manufacturer's Certification").

35.     If a vehicle is altered after the date of manufacture, then the person or entity altering that vehicle (the "Alterer"), "Has a duty to determine continued conformity of the altered vehicle with applicable Federal motor vehicle safety, Bumper and Theft Prevention standards" and the Alterer "[a]ssumes legal responsibility for all duties and liabilities for certification under the Vehicle Safety Act." 49 C.F.R. § 567.7. Similar to the required Manufacturer's Certification, the Alterer must also affix a label to the vehicle certifying, "This vehicle was altered by (individual or corporate name) in (month and year in which alterations were completed) and as altered it conforms to all applicable Federal Motor Vehicle Safety, Bumper and Theft Prevention Standards affected by the alteration and in effect in (month, year)." 49 C.F.R. § 567.7(b)(1) ("Alterer's Certification").

36.     Subject to certain exceptions not applicable here, if a vehicle does not conform to the Federal Safety Standards, including all required certifications, the vehicle cannot be legally imported into the United States unless: (a) the vehicle is used solely for the purposes of research, investigations, show or display, demonstrations or training, or competitive racing events; or (b) the importer has received written permission from NHSTA or the importer is an original manufacturer of motor vehicles (or wholly owned subsidiary thereof) that are certified to comply with all applicable Federal motor vehicle safety standards; and (c) the importer provided NHTSA with documentary proof of export or destruction not later than 30 days following the end of the period for which the vehicle had been admitted to the United States.  *See* 49 C.F.R. § 591.5(j).

37.     Irrespective of whether a vehicle is legally imported from outside the United States or legally manufactured here in the United States (Volkswagen produces some of its cars at a plant located in Chattanooga, Tennessee), any vehicle that does not conform to Federal Safety Standards or that is not properly certified as conforming to Federal Safety Standards cannot be legally sold in the United States.

## B. **Pre-Production Cars**

38.     Pre-production cars are vehicles that allow automakers like Volkswagen to find problems before a new model goes on sale to the public.  Pre-production cars come after prototypes, which themselves are preceded by concept cars. Pre-production vehicles are followed by production vehicles, also called series vehicles ("Series-Production Cars"), which are mass produced and sold to consumers through dealerships.  The point in time when the very first Series-Production automobile is produced is known within the automotive industry as the Start of Production ("SOP") or Job No. 1.

39.    Pre-production cars are divided into two sub-types: pre-series ("Pre-Series Cars") and zero series ("Zero-Series Cars") (collectively "Pre-Production Cars"). Pre-series aims to produce automobiles under similar conditions to Series Production to prove reproducibility, a method known as the production try-out. Pre-Series Cars are followed by Zero-Series Cars, which are produced to ensure the process and product quality is at a customer-acceptable product level. The production of Zero-Series Cars is the last step before SOP and serves as a buffer that hands over responsibility to those within the manufacturing facility tasked to make the Series Production.  Volkswagen refers to the process of creating these Pre-Production Cars, as well as the place within its manufacturing centers where that process occurs, as the Pilot Hall.

40.    Although Pre-Production Cars are very similar to Series-Production Cars, there can be and typically are material differences between the two builds. Subframes can be swapped, steering gears disassembled and blueprinted, rework of the body flanges conducted, modification of panel alignment and door gaps performed, sanding of spot welding and bond work conducted, and implementation of custom exterior paint and the like are not uncommon. Moreover, individual component parts used in the Pre-Production Cars often vary from the component parts used in the Series-Production Cars of the same make, model and year.

41.    Volkswagen has been plagued by delays and other problems within its component-part supply chain over the years, particularly during the 2011 through 2016 time period.  On numerous occasions Volkswagen has been forced to delay SOP because of a lack of available component parts needed for the Series-Production build, and while there can be some flexibility in adjustments to SOP, the timing of when the Pre-Series Cars and Zero-

Series Cars must occur is stringent and unforgiving because the Pre-Production Cars are needed well in advance of SOP for use in Volkswagen's marketing activities. Carmakers like Volkswagen book space at car shows, sometimes more than a year in advance, to promote its latest and soon-to-be-released cars. These shows occur on a date certain and will not be postponed just because Volkswagen's component parts have not yet arrived at its manufacturing facility that results in a delay in Volkswagen's SOP. For this reason, it is not uncommon within Volkswagen that its Pre-Series Cars and Zero-Series Cars are built with component parts substantially different from those components that have been approved and tested for use in the Series-Production Cars.

42.    As a result, it is not uncommon for the weight of Volkswagen's Pre-Production Cars to vary significantly from the weight of its Series-Production Cars. These differences in weight and the distribution of that weight can impact safety as well as the overall crash-worthiness of Pre-Series Cars and Zero-Series Cars compared to Series-Production Cars that are properly tested and certified as compliant with Federal Safety Standards. These differences can also undermine third-party safety ratings of the build of Series-Production Cars to Pre-Production Cars, making those ratings inapplicable to the build of the Pre-Series and Zero-Series Cars of the same make, model and model year. For example, it is questionable whether safety ratings performed by the Insurance Institute for Highway Safety ("IIHS") are applicable at all to any of Volkswagen's Pre-Production Cars, given that the testing and resulting ratings provided by IIHS are based upon the design, build, weight and component parts used in the build of the Series-Production Cars.

43.    At best, the differences between the builds of Pre-Production Cars and the build of the Series-Production Cars create uncertainty regarding the safety of the Pre-Production Cars,

given that the tests performed to ensure compliance with Federal Safety Standards are generally based upon the design, build, weight and component parts specified and approved for the Series-Production Cars, and are not intended to apply to the build of Pre-Production Cars, which often consist of a hodge-podge of whatever components might be available on the manufacturing floor when Volkswagen is rushing to beat the clock to get its Pre-Production Cars to the next car show.

44.     Given the foregoing, at all relevant times herein, it was well understood within Volkswagen that Pre-Production Cars that differ in any material way from Series-Production Cars could not and cannot be sold in the United States to consumers.[1] And it was not difficult for Volkswagen to determine if such material deviations existed. For example, Volkswagen maintains an internal database known as the Elektronischer Teilekatalog, commonly referred to by its abbreviation ETKA, which is the official electronic parts catalogue for Volkswagen-branded and Audi-branded passenger cars. With only a vehicle identification number ("VIN"), the ETKA system will determine whether any given vehicle is a Pre-Series Car or Zero-Series Car, and if so, the ETKA system produces a warning message that states, "caution: preproduction model.     [T]he vehicle contains special equipment/fixtures that are not documented in the genuine parts catalogue."  Volkswagen also maintains an internal as-built database known as the "Daisy System" which documents the as-built condition of each of its Pre-Production Cars.

---

[1]While Volkswagen conceivably could have attempted to have each Pre-Production Car separately tested and individually certified as complying with applicable regulatory standards, to have done that would have been cost-prohibitive insofar as the potential gain to Volkswagen from the sale of such a car would have been outweighed by the cost of individual certification.  For this reason, at least prior to 2011, it was Volkswagen's common practice to only use its Pre-Production Cars for research, investigations, show or display, demonstrations or training, or competitive racing events, and once that use was complete, it was typical for Volkswagen to scrap or export its Pre-Production Cars.

## C. **Press-Fleet Cars**

45.     Volkswagen, like most automobile manufacturers and distributors, expends significant resources to promote each vehicle series for each model year, which typically begins well prior to the time when any Series-Production Cars have been manufactured or are otherwise made available for sale to consumers.

46.     Car shows are some of the most important marketing events that are used very early in the promotional lifecycle of a soon-to-be-released vehicle. It is at these car shows where manufacturers and distributors like Volkswagen provide the automotive press and the public with its first peak at its vehicle line-up for the upcoming model year. The vehicles that Volkswagen uses at such car shows (the "Auto-Show Cars") are typically Pre-Production Cars, given that Series-Production Cars typically have not yet been built or are not otherwise available by the date that these car shows occur.

47.     Before Volkswagen sends any of its Pre-Production Cars to these auto shows, it or one of its contractors preps the car to get it in "show" condition, which is also known as giving the car "press finish." This is yet another reason why there is often substantial variation between the as-built condition of Pre-Production Cars compared to the Series-Production Cars, given that an effort of a body shop to get Auto-Show Cars into "press finish" can and do often involve modifications to the build of those Pre-Production Cars.

48.     After these Auto-Show Cars are no longer needed for display at shows, it is common for Volkswagen to loan these cars to members of the automotive media for evaluation in hopes of generating positive reviews and media coverage for its vehicles. Volkswagen also loans other Pre-Production Cars and Series-Production Cars not otherwise used for display at auto shows to members of the automotive press for the same purpose ("Media-Loaned

Cars"). Volkswagen collectively refers to the Auto-Show Cars and the Media-Loaned Cars as its Press Fleet (the "Press-Fleet Cars").

49.     Press-Fleet Cars take some of the worst abuse and are some of the hardest-driven cars in existence.[2] This occurs for several reasons.  First, manufacturers including Volkswagen encourage members of the automotive media to drive Press-Fleet Cars in a manner that pushes those cars to the limit to "see what this car can really do" in the hopes of getting positive-press exposure that Volkswagen knows money can't otherwise buy.  For example, Volkswagen loaned the Golf that was later purchased by Plaintiff R. Garcia (without knowledge of the prior media use) to Digital Trends journalist Nick Jaynes for a period of six months to enable Jaynes to push that car to its limits. With Volkswagen's blessing and encouragement, upon receiving this car from Volkswagen Jaynes stated, in pertinent part, "[W]e at DT will be putting the Golf R through its paces – and racking up the miles — on the road during our daily commutes, on the track, and on country back roads during a spirited Sunday drive." Nick Jaynes, *VW's 2015 Golf R Sold Out in 24 Hours But Digital Trends Got the First One* (Digital Trends Mar. 13, 2015), *available at* https://www.digitaltrends.com/cars/vws-2015-volkswagen-golf-r-sold-out-in-12-hours-but-digital-trends-the-first-one/ (last visited March 11, 2019).

50.     Second, the use of manufacturer-owned cars, driven on manufacturer-issued plates, at the sole expense of the manufacturer, is viewed by some journalists as a perk of the job to which they are entitled. Believing they have "earned" the right to this revolving use of

---

[2]Matt Hardigree, *The Truth About Press Cars*, (Jalopnik June 29, 2015), *available at* https://jalopnik.com/the-truth-about-press-cars-1714460086 (last visited March 11, 2019) ("I estimate that I've been loaned around $8 million worth of vehicles by car companies to review. These are called 'press cars' and the total cost of delivering these vehicles to me is somewhere in the low six-figures and I've done about five figures' worth of damage to them." Hardigree goes on to acknowledge that when the press-use is completed these cars are "resold without the buyer being told that it was used as an abused rental car by ungrateful journalists.").

manufacturers' hot-off-the-production-line vehicles, these individuals are not shy about "spending" every bit of this bonus. In other words, these journalists aren't slowing down for speedbumps; they aren't trying to dodge potholes; and they aren't otherwise worrying about ramming the tires of their Press-Fleet Car into the curb when parking, and if any of that abuse that happens to cause unseen frame damage, so be it.  Volkswagen is all too happy to encourage this mindset by promoting a pecking order among journalists given that more influential members of the automotive media are often asked to "test" the manufacturer's higher-end vehicles, while less influential members of the media are asked to review cars at the bottom end of the manufacturer's latest new-car offerings. And Volkswagen takes care to ensure that the organizations for which these journalists work also get in on the action, given that if a positive review is published, Volkswagen will often use that review in its own marketing materials and will then pay the journalist's employer a substantial fee for doing so.[3]

51.     Third, manufacturers including Volkswagen seek to expose the greatest number of journalists in the shortest amount of time to its Press Fleet Cars to maximize the return on investment. To do that, Volkswagen limits the time that most journalists are loaned a car to about seven days on average. It is not uncommon for a Press-Fleet Car to be driven by 15 or more separate members of the automotive media during the one-year period when these cars typically remain a part of Volkswagen's Press Fleet. Consequently, the care with which Press-Fleet Cars are driven resembles the same type of rough treatment rental cars

---

[3] "The tricky thing here is that [a press car] blurs the line between journalism and being an arm of the manufacturer's PR,' says Gabe Shenhar, the Senior Auto Test Engineer and Program Manager at *Consumer Reports*." Matt Hardiree, *The Truth About Press Cars*, (Jalopnik June 29, 2015), *available at* https://jalopnik.com/the-truth-about-press-cars-1714460086 (last visited March 11, 2019). Given this conflict of interest, a handful of media organizations like Consumer Reports and the New York Times pay a rental fee to manufacturers for the use of any manufacturer-owned car, even if borrowed solely to allow a review, to avoid even the appearance of impropriety. *Id.*

receive, or even worse, given that there is typically no financial consequence to a journalist who rags out a Press-Fleet Car.

52. Once the next model-year cars are set to be released, Volkswagen disposes of its Press-Fleet Cars that had been used to promote those vehicles from the prior model year. Because most of Volkswagen's Press-Fleet Cars are also Pre-Production Cars and given that those cars materially differ from the Series-Production Cars that conform to Federal Safety Standards, most of Volkswagen's Press-Fleet Cars cannot be legally sold to consumers. From 2011 through 2016, however, Volkswagen executives made the conscious decision to illegally sell its Press-Fleet Cars to consumers and to knowingly falsify the true characteristics of those cars.

## D. Leased-Fleet Cars

53. Many of the functional Pre-Production Cars imported into the United States by Volkswagen, even those that are used for marketing purposes as part of the Press Fleet, are ultimately leased to Volkswagen employees ("Leased-Fleet Cars") before being resold to the public. Some of Volkswagen's Pre-Production Cars are assigned to a general pool of vehicles for short-term loans to Volkswagen employees for their personal use (the "Pool-Fleet Cars"), and many of these cars end up becoming part of the Leased Fleet after being leased to a specific Volkswagen employee.

54. Volkswagen operates its Press Fleet and its Pool Fleet on manufacturer-issued license plates without titling or registering these vehicles for a time after putting those vehicles into functional use. The reason for this delay between the date these vehicles are first used in the United States and the date that the vehicles are first titled in the United States is that Volkswagen typically lacks all required governmental certifications at the time it puts its

Pre-Production Vehicles into first use, and therefore, Volkswagen operates those vehicles by relying upon certain certification exemptions. These exemptions, however, do not permit Pre-Production Vehicles to be sold or leased until such cars are properly certified. Because it is cost prohibitive, Volkswagen does not separately test or seek separate certification for its Pre-Production Cars, but instead, Volkswagen simply relies upon the certification it obtains for the build of its Series-Production Cars once that certification process is complete. This attempt by Volkswagen at certification is not valid because of material differences that typically exist between the build of its Pre-Production Cars and the build of its Series-Production Cars that is properly tested and approved.

55. Given the foregoing, it is typical for Volkswagen to apply for the original title and registration of its Pool-Fleet Cars and Press-Fleet Cars only after those cars have been driven a significant number of miles on manufacturer-issued or distributor-issued plates. Because a substantial portion of Volkswagen's Leased-Fleet Cars originate from Volkswagen's Pool Fleet, it is also typical for the cars within the Leased Fleet to have been driven a substantial number of miles at the time of application for the initial title and registration.

### E. The Odometer Fraud

56. Because Volkswagen knows that material differences typically exist between its Pre-Production Cars and its Series-Production Cars, Volkswagen attempted to hide this fact, in part, by disguising the time period within which its Pre-Production Cars, Press-Fleet Cars, and Pool-Fleet Cars were most-extensively used. Volkswagen is able to avoid regulatory scrutiny as to whether a given vehicle is a Pre-Production Car if Volkswagen retains its Pre-Production Cars for internal use until the time when such vehicles are driven a

minimum number of miles so that the car will be considered to be "used" under applicable state law upon subsequent titling and registration, and thereby exempted from some of the scrutiny applicable to "new" cars.

57.     Mileage driven prior to the time of the initial titling and registration does not count toward the determination of whether a vehicle is classified as new or used for purposes of being exempt from certain new-car certification requirements.  This creates an incentive for Volkswagen to lie on its application for the original title for its Pre-Production Cars, Press-Fleet Cars and Pool-Fleet Cars about the mileage of those cars at the time when the application for original title is made.  Simply put, it is to Volkswagen's advantage to claim that its Pre-Production Cars, Press-Fleet Cars and Pool-Fleet Cars have no miles or low miles at the time of initial title application, and to subsequently claim when it resells those cars to consumers that the mileage shown on the odometer occurred <u>after</u> the date or original titling and registration, even though most of the mileage on these vehicles occurred <u>before</u> the initial titling.

58.     Volkswagen knows that lying about the mileage at the time of the original application for title and registration will also camouflage to consumers the vehicle's use history as well as the value of that used vehicle.  Specifically, if Volkswagen were to honestly report that thousands of miles of use was put on a vehicle prior to the date of original titling and registration, a consumer might discover that such vehicle was used by many other individual drivers as part of Volkswagen's Press Fleet (when falsely represented to be a "CARFAX 1-Owner" car purportedly used for only a short period of time as part of Volkswagen's "corporate fleet") or Volkswagen's Pool Fleet (when falsely represented to be a "CARFAX 1-Owner" car purportedly used for only a short period of time as a

"personal lease"). As explained in the introduction of this Complaint, disclosure of the timing of when the Class Vehicles were first extensively driven could have also revealed that the vehicle under consideration was a Pre-Production Car that could not be legally sold.

59. These temptations proved too much for Volkswagen insofar as it falsified the mileage of its Pre-Production Cars, Press-Fleet Cars and Pool-Fleet Cars when applying for the original title and registration. Specifically, Volkswagen falsely claimed that only 10 miles had been driven on these cars as of the time of initial titling and registration, rather than being honest and disclosing that most of the miles driven on Volkswagen's Pre-Production Cars, Press-Fleet Cars and Pool-Fleet Cars occurred before the initial titling and registration. This dishonesty allowed Volkswagen to sell its Pre-Production Cars, Press-Fleet Cars and Pool-Fleet Cars much more quickly as "used" (resulting in less regulatory scrutiny) by counting pre-titling mileage as if it had occurred after the initial title issued. This fraud also allowed Volkswagen charging a higher resale price for these cars by keeping its customers in the dark about these vehicles' history of use. Volkswagen ensured its prospective customers would rely on this false information by repeating these lies to every sales prospect who showed interest in one of its CPO cars, by-and-through a Carfax Report containing the false-mileage information, as well as the misleading designation of each of these vehicles as a "1-Owner" car. Volkswagen's fraud worked insofar as it led to the sale of the Class Vehicles to Plaintiffs and the Class members.

60. Plaintiff R. Garcia and Plaintiff Jacobson are each typical examples of the average Class member against whom Volkswagen perpetrated the Odometer Fraud. In Plaintiff R. Garcia's case, Volkswagen applied for the initial title and registration for the Golf on

December 16, 2015, falsely claiming on its title application that the Golf had been driven only 10 miles as of that date. Volkswagen repeated this lie to R. Garcia in the Carfax Report that Volkswagen provided to R. Garcia just prior to his purchase of the Golf.  Contrary to Volkswagen's representations, the Golf had been driven thousands of miles as of December 16, 2015.  Volkswagen reported this false information to Carfax to make it appear on the Carfax Report that the Golf had been driven 9,430 miles during the one-month period of time from December 16, 2015 when Volkswagen first reported the Golf as having only 10 miles on the odometer until January 20, 2016 when Volkswagen transferred the Golf to one of its dealers and reported the odometer to read 9,430 miles in preparation to sell the Golf as a Certified Pre-Owned "1-Owner" vehicle.

61.     R. Garcia did not discover that Volkswagen's claim was false that the Golf had only been driven 10 miles as of December 16, 2015 until after engaging undersigned counsel, who in January 2019 traced the service records for R. Garcia's Golf back through the year prior to R. Garcia's purchase. These records revealed that Dick Hannah Volkswagen in Vancouver, Washington serviced the Golf on August 14, 2015, and recorded the mileage as of that date to be 8,580 miles. Dick Hannah invoiced VWGOA for this service (as well as many others) and included the correct mileage on that invoice. Consequently, VWGOA knew that the mileage on the Golf was NOT 10 miles as of December 16, 2015 when Volkswagen made that false representation when it initially titled the Golf, and Volkswagen knew exactly what it was doing when it repeated that lie to R. Garcia in the Carfax Report.

62.     As a result of this falsification of the mileage by VWGOA, the Carfax Report given to R. Garcia also falsely states that his Golf was used only as a "corporate fleet" vehicle for an estimated length of ownership of only "1 month" with such ownership allegedly occurring

within the state of Michigan.  The truth, however, is that the Golf was a Zero-Series Car that had been driven hard by journalists for thousands of miles across numerous states over a 10-month time period as part of Volkswagen's Press Fleet.  This information was strategically concealed by Volkswagen from R. Garcia to fraudulently induce R. Garcia's purchase of the Golf, and it worked.

63.     The Odometer Fraud perpetrated by Volkswagen against R. Garcia is not an isolated occurrence, but instead represents a pattern of fraud that VWGOA has repeated over-and-over again in selling the Class Vehicles. For example, in Plaintiff Jacobson's case, Volkswagen applied for the initial title and registration for the CC R-Line on October 21, 2015 and falsely represented that the CC R-Line had been driven only 10 miles as of that date. Volkswagen repeated this lie to Jacobson in the Carfax Report that Volkswagen provided to Jacobson just prior to his purchase of the CC R-Line.   Contrary to Volkswagen's representations, the CC R-Line had been driven thousands of miles as of October 21, 2015.  Volkswagen reported this false information to Carfax to make it appear on the Carfax Report that the CC R-Line had been driven 5,310 miles during the two-month period of time from October 21, 2015 when Volkswagen first reported the CC R-Line as having only 10 miles on the odometer until January 5, 2016 when Volkswagen transferred the CC R-Line to one of its dealers and reported the odometer to read 5,310 miles in preparation to sell the CC R-Line as a Certified Pre-Owned "1-Owner" vehicle.

64.     Jacobson did not discover that Volkswagen had lied when it claimed that the CC R-Line had only been driven 10 miles as of October 21, 2015 until after engaging undersigned counsel, who in January 2019 traced the service records for Jacobson's CC R-Line back through the year prior to Jacobson's purchase. These records revealed that Royal Motor

Sales in San Francisco, California serviced the CC R-Line on June 22, 2015, and recorded the mileage as of that date to be 3,231 miles. Royal Motor Sales invoiced VWGOA for this service (as well as many others) and included the correct mileage on that invoice. Consequently, VWGOA knew that the mileage on the CC R-Line was <u>NOT</u> 10 miles as of October 21, 2015 when Volkswagen made that false representation when it initially titled the CC R-Line, and Volkswagen knew exactly what it was doing when it repeated that lie to Jacobson in the Carfax Report.

65. As a result of this falsification of the mileage by VWGOA, the Carfax Report given to Jacobson also falsely states that his CC R-Line was used only as a "corporate fleet" vehicle for an estimated length of ownership of only "2 months" with such ownership allegedly occurring entirely within the state of Michigan.  The truth, however, is that the CC R-Line was a Zero-Series Car that had been driven hard by journalists for thousands of miles across numerous states over an 8-month time period as part of Volkswagen's Press Fleet.  This information was strategically concealed by Volkswagen from Jacobson to fraudulently induce Jacobson's purchase of the CC R-Line, and it worked.

66. This Odometer Fraud perpetrated by VWGOA against Plaintiff R. Garcia and Plaintiff Jacobson is typical of the same pattern by which Volkswagen deceived the other Class members (e.g.  into purchasing the Class Vehicles.

## F.  Volkswagen's Certified Pre-Owned Program

67. The sale of used Audi-branded and Volkswagen-branded passenger cars is critical to Volkswagen's overall sales and growth strategy in the United States. Specifically, the price at which a vehicle manufacturer and distributor like Volkswagen can sell its used cars has a direct relationship with the demand and resulting price at which Volkswagen can sell its

new cars.  This relationship is measured by the so-called residual value of the used cars Volkswagen sells, which reflects how well a used car holds its value in the marketplace, as of a given date, expressed as a percentage of the vehicle's suggested manufacturer's retail price ("MSRP").

68.    In the late 2000s, Volkswagen analyzed its used-car sales in the United States and found those sales to be lacking, particularly with respect to residual value. In response, Volkswagen sought to optimize residual value of its used-car sales by expanding sales of its so-called Certified Pre-Owned ("CPO") vehicles.

69.    A certified pre-owned vehicle program is one in which a vehicle manufacturer or its distributor sells certain used vehicles through its network of dealers where the vehicle has been "certified" as having met certain criteria.  The idea of the CPO program operated by Volkswagen for both Audi-branded and Volkswagen-branded cars is to create the impression among prospective used-car buyers that a "certified" pre-owned vehicle is of a significantly greater quality and reliability than an otherwise identical vehicle that has not been "certified."  To reinforce the notion that a "certified" pre-owned car can be trusted to a much greater degree than a non-certified car, Volkswagen offers an extended (albeit limited) warranty that is "free" to the customer (paid for to Volkswagen by its dealers), which accompanies only those pre-owned cars that have Volkswagen's "certified" seal of approval.

70.    The benefits realized by Volkswagen from its CPO program are significant. First, Volkswagen can sell CPO Cars for as much as $6,000.00 more per unit than similarly situated non-CPO cars.  For example, in 2010 the average selling price of an Audi-branded CPO Car was $31,060, while the average selling price for an Audi-branded non-CPO car

was only $25,012.  Similarly, in 2011, the average selling price of an Audi-branded CPO Car was $31,713, while the average selling price for an Audi-branded non-CPO car was only $26,986.

71.     Second, CPO car sales expand Volkswagen's customer base, increases brand visibility, and raises residual values of Volkswagen's used-car sales, which in turn, creates greater demand and higher sales prices for Volkswagen's new cars.

72.     Third, the average number of days it takes to sell a CPO Car can be and has been significantly less than a non-CPO Car, which leads to faster inventory turnover and greater profitability.

73.     Fourth, Volkswagen is paid a fee by its dealers for the extended warranty that accompanies each CPO Car, which can generate $2,000 or more of additional revenue for Volkswagen for each CPO car sold.

74.     Fifth, Volkswagen derives significant revenue by financing CPO Cars to its customers through its captive lender VW Credit a/k/a Audi Financial Services, earning Volkswagen hundreds of millions in additional revenue through financing provided for CPO Car sales. CPO-car purchasers are more than two times more likely to use VW Credit to finance the purchase than are purchasers of non-CPO cars.

75.     Sixth, the expansion of CPO Car sales has significantly increased revenue from Volkswagen's sales of parts and related services for its CPO Cars.

76.     Given the foregoing, it is no wonder that internally Volkswagen refers to its CPO program as a "Certified Profit Opportunity."

77.     Understanding the importance of its CPO program to its overall profitability, in 2011 Volkswagen began to push the development of its CPO sales harder than it had ever before.

Beginning in 2011, Volkswagen implemented an aggressive CPO bonus program to incentivize its dealers to purchase off-lease vehicles, rather than selling those cars at public auction, to limit public supply of late-model low-mileage Volkswagen-branded and Audi-branded cars, and to thereby increase CPO demand. During this same timeframe, Volkswagen also significantly increased its advertising dollars spent specifically for marketing its CPO programs. Simultaneously, Volkswagen implemented aggressive financing incentives for qualified buyers of its CPO Cars and paid its dealers up to a $500 bonus for each CPO-Car sale in which its dealer was able to persuade the consumers to finance their CPO Car through VW Credit.

### G. The Carfax Con-Job

78.   Volkswagen's push to maximize residual value of its used-car sales through its CPO programs culminated with the execution of a so-called "Agreement for Audi/Volkswagen Certified Pre-Owned Programs" (the "Carfax Contract") between VWGOA and Carfax, Inc. ("Carfax"), effective June 1, 2011 (the "Effective Date"), which was signed by Richard Raines, President of Carfax, and Michael Lohscheller, CFO of VWGOA, and which has been in effect from the Effective Date to the present. A summary of the most important provisions of the Carfax Contract are as follows:[4]

- ■   VWGOA agreed to provide Carfax with access to a "daily data file feed" reflecting its dealers' inventory of Audi-branded and Volkswagen-branded certified pre-owned vehicles, including the mileage on the date the vehicle was titled, the mileage on the date that the car became a "certified pre-owned vehicle" ("CPO Car") and the mileage on the date the vehicle was sold ("Volkswagen-Generated Vehicle History"). Carfax, in turn, agreed to publish the Volkswagen-Generated Vehicle History on a so-called Carfax Vehicle History Report (the "Carfax Report");

---

[4] The important provisions of the Carfax Contract to the present lawsuit are quoted in their entirety in this Complaint in the section concerning Plaintiffs' Common-Law Claims under Count III for Breach of Contract.

■   VWGOA agreed to promote Carfax on all AUDI/VW Certified Pre-Owned window stickers, on AUDI/VW Certified Pre-Owned training materials, in all AUDI/VW Certified Pre-Owned operations manuals, in all AUDI/VW Certified Pre-Owned inspection checklists, and in all AUDI/VW Certified Pre-Owned POP materials and displays;

■   VWGOA agreed to require its dealers to provide the Carfax Report containing the Volkswagen-Generated Vehicle History to each purchaser of a CPO Car, which purchaser was to also receive a "Buyback Guarantee Certificate" from Carfax, which as explained hereinafter, instilled a false confidence in the mind of each CPO Car purchaser that the information contained in the Carfax Report was accurate;

■   VWGOA agreed to provide documentation to Carfax correcting information when it becomes known to VWGOA (directly or through a Participating AUDI/VW Dealer) that information on a record previously provided to Carfax was in error.

■   VWGOA agreed that a car would be deemed ineligible for the AUDI/VW Certified Pre-Owned Programs, and that it would not offer any vehicle for sale as a CPO Car if the Carfax Report contains a notation indicating Not Actual Mileage Title, Potential Odometer Rollback, or Not Built to US Standards;

■   VWGOA agreed to comply with all federal, state and local law applicable to its obligations and activities under the Carfax Contract;

79.   Neither Carfax nor Volkswagen disclosed to Plaintiffs or any other Class Members prior to their purchase of a Volkswagen or Audi-branded CPO Car that a significant portion of each Class Vehicle's "history" contained in the Carfax Report comes straight from Volkswagen, rather than from some "independent" third party. Quite to the contrary, both Carfax and Volkswagen falsely suggested that Volkswagen maintained no involvement in originating and assembling the data contained in the Carfax Report. For example, on the top header of the front page of each Carfax Report, Carfax refers to itself as an "independent company" as shown here:



80.     Volkswagen sent the same misleading message to Plaintiffs and Class Members.  In its Audi CPO training materials for its dealers and salespeople, for example, Volkswagen stressed that prospective customers should be told that each CPO Car has "passed" the Carfax Report, which provides "assurance that Audi carefully considers a vehicle's history when determining its Certified pre-owned eligibility."

81.     The notion that Volkswagen and Carfax are independent of each other is wildly inaccurate. Carfax, Inc., is a wholly owned subsidiary of R.L. Polk & Company ("Polk"). VW America has engaged Polk for years as its business consultant, to obtain market data on prospective customers, and to create marketing strategy. Not long after the execution of the Carfax Contract in 2011, VW America significantly expanded Polk's consulting role the following year, paying it millions of dollars in annual fees to help VW America achieve its goal of selling 800,000 cars annually in the U.S. market, and to help its Audi division to become the "most-desired premium car brand" in the U.S. market by 2020.  Volkswagen's failure to disclose its close ties with Carfax as well as its failure to disclose that Volkswagen itself was the source for a significant portion of non-independent data used to create the Carfax Reports, was just the beginning of Volkswagen's deceptive use of its CPO program and its relationship with Carfax.

82.     Prior to the time when Plaintiffs and each Class member purchased their respective Class Vehicle, they were provided with a Carfax Report for the Class Vehicle under consideration.  Each Carfax Report contained a section called the "CARFAX Price Calculator" that purported to show how much more a consumer should be willing to pay above retail book value for the CPO Car under consideration, given that particular CPO Car's vehicle history. A representative sample of this representation made to Plaintiffs and

Class Members, which is taken from the Carfax Report provided to Plaintiff Jacobson to induce his purchase of his CC R-Line, is shown below:



83.     In the CARFAX Glossary section of each Carfax Report provided to each Class Member, it states, "The vehicle's retail book value plus the CARFAX Price Adjustment will give you a more accurate measure of the vehicle's value."

84.     A primary factor used by Carfax to support an upward price adjustment to the otherwise applicable retail book value is if the Carfax Report reflects that the car under consideration is a one-owner vehicle.  According to Carfax, one-owner cars are more valuable, in part, because of the perception among buyers that there is "a consistency to how the vehicle has been driven."  https://www.carfax.com/blog/one-owner-cars  (last visited 02/12/2019).  Carfax highlights the importance it places on this factor in the following graphic on its website:



85.     The purported one-owner status of a vehicle is given prominence in the Carfax Report insofar as it is placed in a banner at the top of the front page of the report, and it is additionally called out by a color graphic, samples of which are shown here:




86.     In the CARFAX Glossary section of each Carfax Report, it states, "CARFAX defines an owner as an individual or business that _possesses and uses a vehicle_. Not all title transactions represent changes in ownership. To provide estimated number of owners, CARFAX proprietary technology analyzes all the events in a vehicle history." (Emphasis added).

87.     Volkswagen and Carfax represented the Class Vehicles to be so-called "one-owner" cars, but this representation was false, given that an owner is defined in the Carfax Report as "an individual or business that possesses and uses a vehicle." Volkswagen's CPO Cars that were part of the Press Fleet or the Pool Fleet (to the extent transferred from the Pool Fleet to later become part of the Leased Fleet) would not meet the definition of a "one-owner" car because multiple persons, both inside and outside of Volkswagen, used and possessed these Class Vehicles before they were sold to Plaintiffs and Class Members.  Volkswagen actively concealed this information from Plaintiffs and Class Members, which thereby enabled Volkswagen to sell Class Vehicles that it would not have otherwise been able to sell at a price for the Class Vehicles that Volkswagen would not have otherwise been able to obtain.

### H.  Skyrocketing CPO Sales Leads to More Fraud

88.     Volkswagen's efforts to expand its CPO-Car sales through both legal and illegal means were wildly successful as Volkswagen's CPO-Car sales skyrocketed. In 2011, Volkswagen sold more CPO Cars than it had ever sold in a single year in company history, selling 72,969 VW-branded CPO Cars and selling 37,259 Audi-branded Cars, for total combined CPO Car sales of 110,228 units, a 32% increase over 2010 levels.  Volkswagen set new company CPO Car sales records again for the next two years, selling a combined total VW-branded and Audi-branded CPO Cars of 133,812 units in 2013 and 139,543 units in 2014.

Volkswagen's CPO Cars sales remained stellar in 2015 with 137,199 units sold, before softening in 2016 with 117,288 units sold.



89.     Although this rapid increase in sales of Volkswagen's CPO Cars was precisely what Volkswagen wanted, this expansion caused another problem of its own – it became increasingly difficult for Volkswagen to maintain an adequate supply of CPO-eligible cars to meet CPO-Car demand.

90.     This strain on CPO-Car supply resulted, in part, from the fact that a significant portion of Volkswagen's CPO-eligible cars come from lease maturities. In 2012 and 2013, lease maturities declined significantly, and in 2014 lease maturities were barely at 2010 levels. For example, for its Audi-branded cars, Volkswagen had lease maturities in 2010 and 2011 of 44,232 units and 46,659 units respectively, which then dropped in 2012 and 2013 to 37,195 and 38,758 respectively, and even in 2014 lease maturities remained slightly behind 2010 levels with only 44,037 units maturing in 2014.

91.   Faced with record CPO-Car demand combined with the slump in CPO-eligible car supply, along with a desire to make ever greater profits, Volkswagen made the conscious decision that it would not continue to comply with Federal Safety Standards by scrapping or exporting its Pre-Production Cars as had been Volkswagen's practice prior to 2011. Instead, Volkswagen decided to cheat.

92.   Specifically, after what typically amounts to a year of use within Volkswagen's Press Fleet, its Pooled Fleet, or its Leased Fleet (or some combination of use within and between these fleets), Volkswagen began to route its Pre-Production Cars to be retrofitted at one of its retrofitting centers to prepare those cars for resale to U.S. consumers.

93.   Volkswagen did not track the modifications made to its Pre-Production Cars during the retrofitting process, and therefore, Volkswagen was legally prohibited from releasing those cars for sale to U.S. consumers even if the build of the Pre-Production Cars was not materially different from the properly certified build of the Series-Production Cars. Yet, even if Volkswagen had properly tracked the changes it made to its Pre-Production Cars during the retrofitting process, the sale of any of those cars to U.S. consumers would still have been illegal because Volkswagen failed to provide the Alterer's Certification with respect to any of its Pre-Production Cars that were retrofitted, including each of the Class Vehicles.

94.   Consequently, none of Volkswagen's Pre-Production Cars were legally eligible to be sold, insofar as those vehicles are not properly certified for sale to U.S. consumers and the safety of those vehicles could not and cannot be assured.  Nevertheless, Volkswagen proceeded to sell those Pre-Production Cars, including the Class Vehicles, while hiding this information from consumers, including Plaintiffs and Class Members.

## I. **The Sneaky Recall**

95.    Given the discovery of Volkswagen's fraud relating to its diesel cars in 2015 and the ensuing litigation in the years following that scandal, Volkswagen determined that it was only a matter of time before it would be caught for its illegal sale of Pre-Production Cars.

96.    To attempt to minimize the cost from the discovery by regulators or the public of its Pre-Production Fraud, Volkswagen conducted an internal study to determine exactly how many Pre-Production Cars were illegally sold; what Volkswagen's legal exposure would likely be as a result of such illegal sale; and how Volkswagen should handle these illegal sales to minimize the cost of its misconduct.

97.    In August 2016, Volkswagen completed this study and drafted a report (the "Pre-Production Sales Report") that was provided to Herbert Diess ("Diess"), who served both then and now as the CEO of VW Germany.

98.    As part of the Pre-Production Sales Report and subsequent investigation, Volkswagen identified more than 3,000 specific Pre-Production Cars, by VIN, that had been illegally sold in the United States, and which may pose a safety threat to U.S. consumers. Diess was made aware of these figures.  Yet, Volkswagen took no action at that time to notify U.S. regulators or consumers of the problem, or to warn U.S. regulators or consumers of the potential safety threats created by the sales of these Pre-Production Cars.

99.    Instead, Volkswagen waited until May 16, 2018 to file a so-called Part 573 Safety Recall Report (the "Recall Report") with the NHTSA.  In that report (as amended), Volkswagen falsely claimed that there were only 252 Pre-Production Cars (the "Recalled Vehicles") that are "potentially involved" and issued a recall for those vehicles.  These Recalled Vehicles include the following:

- 2012-2016 Volkswagen Eos
  Production Dates: Feb. 16, 2011 – April 2, 2015
  VIN Range: Begin: WVWFW7AH1CV000781
  VIN Range: End: WVWBW8AH4G000011
  Note: VIN Range Not Sequential
  Recall Code:  01C5

- 2013-2016 Volkswagen CC (F)
  Production Dates: Jan. 19, 2012 – Nov. 18, 2015
  VIN Range: Begin: WVWAP7AN9DE500024
  VIN Range: End: WVWKP7AN1GE509289
  Note: VIN Range Not Sequential
  Recall Code:  01C5

- 2012-2012 Volkswagen CC
  Production Dates: Mar. 2, 2011 – Mar. 2, 2011
  VIN Range: Begin: WVWNN7AN9CE507027
  VIN Range: End: WVWHN7ANXCE508202
  Note: VIN Range Not Sequential
  Recall Code:  01C5

- 2011-2013 Volkswagen GTI (A6)
  Production Dates: Feb. 25, 2011 – April 17, 2013
  VIN Range: Begin: WVWFV7AJ2BW218372
  VIN Range: End: WVWED7AJ6DW134105
  Note: VIN Range Not Sequential
  Recall Code:  01C5

- 2015-2015 Volkswagen e-Golf
  Production Dates: May 21, 2014 – Nov. 13, 2014
  Recall Code:  01C5

- 2011-2016 Volkswagen Golf(A6)
  Production Dates: Mar. 2, 2011 – Oct. 27, 2015
  VIN Range: Begin: WVWMM7AJ8BW228527
  VIN Range: End: WVWUF7AU8GW138533
  Note: VIN Range Not Sequential
  Recall Code:  01C5

- 2011-2014 Volkswagen Touareg (New)
  Production Dates: Oct. 28, 2010 – Feb. 12, 2014
  VIN Range: Begin: WVGFG9BP2BD002456
  VIN Range: End: WVGDP9BP9ED009335
  Note: VIN Range Not Sequential
  Recall Code:  01C5

- 2015-2015 Volkswagen Touareg (GP)
  Production Dates: Oct. 2, 2014 – Nov. 10, 2014
  VIN Range: Begin: WVGEP9BP0FD001288
  VIN Range: End: WVGEG9BP9FD003086
  Note: VIN Range Not Sequential
  Recall Code:  01C5

- 2012-2015 Volkswagen Tiguan
  Production Dates: Feb. 28, 2011 – Dec. 23, 2014
  VIN Range: Begin: WVGBV7AX5CW000006
  VIN Range: End: WVGAV7AX3FW567184
  Note: VIN Range Not Sequential
  Recall Code:  01C5

- 2013-2015 Volkswagen Golf (A6)
  Production Dates: Mar. 22, 2012 – Nov. 8, 2014
  VIN Range: Begin: WVWAB7AJ1DW000025
  VIN Range: End: WVWLF7AU3FW140152
  Note: VIN Range Not Sequential
  Recall Code:  01C6

- 2012-2012 Volkswagen Tiguan
  Production Dates: June 23, 2011 – June 23, 2011
  VIN: WVGAV7AXXCW500173
  Recall Code:  01C6

100. For the above-specified vehicles designated with the Recall Code 01C5, which consists of 233 Zero-Series Cars, Volkswagen admitted in its Recall Report that such vehicles "are unable to be repaired with parts or software updates."

101. In the Recall Report, Volkswagen provided a misleading explanation for its illegal sales of Pre-Production Cars as follows:

> Recall vehicles are zero-series vehicles (very early production vehicles). Volkswagen has discovered that documentation about some of the possible modification(s) made to these vehicles during their internal use period may be incomplete. Because of this, Volkswagen cannot verify that the vehicles comply with all applicable regulatory requirements. The recalled vehicles differ from non-recalled vehicles in that the actual build status of the recalled population was not properly documented in Volkswagen's IT systems.

102.    In giving the foregoing explanation, Volkswagen made it appear that when it sold these 252 Pre-Production Cars it did so as a result of an innocent mistake – an oversight by Volkswagen to properly document the "actual build status" within Volkswagen's IT systems.  To be sure, as to the cause of the recall, Volkswagen misleadingly reported to the NHTSA in the Recall Report that it had fixed the problem claiming, "In August 2016, processes were been [sic] implemented in internal IT systems to prevent the sale of special build (e.g. zero-series vehicles) to consumers."

103.    These explanations and proposed solutions by Volkswagen to the NHTSA and to the public are misleading because Volkswagen knew that the Recalled Vehicles could not be legally sold in the United States prior to the time they were sold, yet Volkswagen intentionally and knowingly sold those cars anyway.  For example, in a June 5, 2013 e-mail from VWGOA employee Tim Glynn to VWGOA employees Matthew Bullion, Robert Martell and Eric Mowinski, on which, *inter alia*, then-VWGOA Executive Vice President & Chief Communications Officer Scott Vazin was copied, Mr. Glynn specifically warned, "[T]he Touareg R-Line & Tiguan R-Line need to be scrapped as they are early or heavily modified vehicles." Yet, VWGOA ignored these warnings and proceeded to sell these cars to consumers.  One of these cars was the Tiguan illegally sold to Plaintiff Glover.

104.    These illegal sales began in 2011 at the direction of VW Germany executives.  For example, Chi-han Chen, who served as head of quality assurance at Volkswagen's Chattanooga plant during the 2011-2014 time period, admitted to VWGOA employee Greg McReynolds on November 5, 2014 that he had been instructed to sell Zero-Series Cars by VWAG executives in Wolfsburg since 2011.  McReynolds reported this confession made by Chi-han Chen that same day to his superiors, VWGOA executives Mike Hennard and

Robert McCarthy stating, "Chi-Han also advised me that Chattanooga, his department and others have received Wolfsburg approval to retrofit and sell their zero series cars for the last 3 years (he mentioned durability cars are typically not included). Judging from where this is heading, if the plan is to avoid the retail sale of the cars this may take some pressure from both of you and perhaps higher leadership."

105.   This pressure from "higher leadership" never came given that Volkswagen continued to knowingly sell its Pre-Production Cars to consumers for years after being made expressly aware of the illegal sales orchestrated by, *inter alia*, Chi-han Chen out of Volkswagen's Chattanooga plant.  To date, Chi-han Chen continues to be employed by Volkswagen.

### J.  Tolling of the Statute of Limitations

106.   At some point in time after the May 16, 2018 Recall Report was filed with the NHTSA, Plaintiffs and Class Members first learned of the fraud perpetrated by Volkswagen described herein.  The Plaintiffs and Class Members could not have reasonably discovered the fraud prior to May 16, 2018.

107.   Volkswagen, by its fraudulent actions described herein, inhibited the ability of Plaintiffs and Class Members to bring a lawsuit against VWGOA prior to May 16, 2018, and therefore, any applicable statute of limitations was tolled until at least that date, or otherwise did not begin to run until at least that date.  Alternatively, VWGOA is estopped from asserting any otherwise applicable statutes of limitation as a defense, given Volkswagen's misconduct.

## CLASS ACTION ALLEGATIONS

108.    Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure

23(a); (b)(1); (b)(2); (b)(3); and/or (c)(4), on behalf of themselves and all others similarly

situated as members of the following Nationwide Class and State Classes (collectively, the

"Classes"); on their federal and state claims as the purchasers of the Class Vehicles.

### A.  Class Vehicles Defined

109.    The Class Vehicles are defined as follows:

> All Volkswagen-branded or Audi-branded used cars sold in the United States from
> June 1, 2011 to March 21, 2019 by any authorized Volkswagen or Audi dealership,
> designated as a Certified Pre-Owned ("CPO") vehicle and represented to be a
> "CARFAX 1-Owner" vehicle, and which has at least one or more of the following
> characteristics:

> (a)      the vehicle is a pre-series, zero series or pre-production car ("Pre-
> Production Cars");

> (b)      the vehicle is one of the 252 cars (the "Recalled Vehicles") identified by
> Volkswagen in its so-called Part 573 Safety Recall Report filed with the
> NHTSA on May 16, 2018 (as amended on July 23, 2018);

> (c)      the vehicle was driven by one or more members of the automotive press
> ("Press-Fleet Cars"), but such use was not disclosed in the Carfax Report,
> and instead the vehicle was represented in the Carfax Report to have been
> possessed and driven only by Volkswagen as a corporate fleet vehicle;

> (d)      the vehicle was driven by one or more Volkswagen employees ("Pool-Fleet
> Cars"), but such use was not disclosed in the Carfax Report, and instead the
> vehicle was represented in the Carfax Report to have been possessed and
> driven by only one individual as a personal lease vehicle.

110.    The proposed Classes are defined as:

### B.  Nationwide Class

All persons and entities in the United States who purchased a Class Vehicle.

### C.  California State Class

All persons and entities in the state of California who purchased a Class Vehicle

### D.  Colorado State Class

All persons and entities in the state of Colorado who purchased a Class Vehicle.

### E. Florida State Class

All persons and entities in the state of Florida who purchased a Class Vehicle.

### F.  Illinois State Class

All persons and entities in the state of Illinois who purchased a Class Vehicle.

### G.  New Jersey State Class

All persons and entities in the state of New Jersey who purchased a Class Vehicle.

### H.  Washington State Class

All persons and entities in the state of Washington who purchased a Class Vehicle.

111. Excluded from the Classes are: (a) Defendants, including any entity or division in which Defendants have a controlling interest, as well as their agents, representatives, officers, directors, employees, trustees, parents, children, heirs, assigns, and successors, and other persons or entities related to, or affiliated with Defendants; (b) the Judges to whom this case is assigned, their staff, and their immediate families; and (c) governmental entities. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

112. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

113. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the

numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

### I.  Numerosity and Ascertainability

114.    The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  There are believed to be at least 20,000 members in the Nationwide Class, and a hundred or more members in each State Class. The precise number and identities of Nationwide Class and State Class may be ascertained from Volkswagen's books and records and motor vehicle regulatory data.  Defendants have comprehensive lists of Class Vehicle owners in their possession and are using them to communicate in writing to at least some of the Class members since July 2018. Accordingly, the disposition of the claims of Class members in a single action will provide substantial benefits to all parties and to the Court.  Class members may be readily notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

### J.  Typicality

115.    The claims of the representative Plaintiffs are typical of the claims of the other Class members in that the representative Plaintiffs, like all Class members, purchased a Class Vehicle designed, manufactured, and distributed by Volkswagen, which has a build history and/or use history that was misrepresented by Volkswagen. The misrepresentations alleged to have been made by Volkswagen to the Class members about the Class Vehicles are limited in number and set forth in writing in the Carfax Report that accompanied each sale of every Class Vehicle.   The representative Plaintiffs, like all Class members, have been

damaged by Defendants' misconduct in that they have incurred similar or identical losses relating to the Class Vehicles. Furthermore, the factual underpinning of Defendants' misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all Class members.

### K. Predominance of Common Questions

116. There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any question affecting only individual Class members. The answers to these common questions will advance the adjudication or resolution of the litigation as to all Class members. These common legal and factual questions include:

(a)   whether Volkswagen manufactured, advertised, marketed, distributed, sold, or otherwise placed the Class Vehicles into the stream, of commerce in the United States;

(b)   whether Volkswagen knowingly sold Class Vehicles in the United States that did not conform to Federal Safety Standards or that were not otherwise properly certified for sale;

(c)   whether Volkswagen knowingly committed Odometer Fraud by falsifying the mileage of the Class Vehicles when making application for the original title, and whether Volkswagen caused such false information to be republished to Plaintiffs and Class members at the time of purchase of the Class Vehicles to hide the true history of the Class Vehicles;

(d)   whether Volkswagen made other material misrepresentations regarding the Class Vehicles;

(e)   whether Volkswagen actively concealed or failed to disclose material facts about the Class Vehicles;

(f)   whether Volkswagen had a duty to disclose the true nature of the Class Vehicles to Plaintiffs and Class members;

(g)   whether Volkswagen's concealment of the true nature of the Class Vehicles would have induced a reasonable consumer to act to their detriment by purchasing one of the Class Vehicles;

(h)　　whether the Class Vehicles can be made to comply with Federal Safety Standards, including certification requirements, within a reasonable time;

(i)　　whether Volkswagens' conduct violated consumer protection statutes, warranty laws, and other laws as alleged herein;

(j)　　whether Plaintiffs and Class members are entitled to a declaratory judgment;

(k)　　whether Plaintiffs and Class members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

(l)　　whether Plaintiffs and Class members are entitled to damages and other monetary relief, and, if so, in what amount.

## L.  Superiority

117.　A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs and Class members have all suffered and will continue to suffer economic harm and damage as a result of Defendants' unlawful and wrongful conduct, which was directed toward Class members and the public as a whole, rather than specifically or uniquely against any individual Class members.

118.　Volkswagen has acted in a uniform manner with respect to the Plaintiffs and Class members.  Absent a class action, many Class members would likely find the cost of litigating their claims prohibitively high and may therefore have no effective remedy at law.  Because of the relatively small size of many of the individual Class members' claims, it is likely that only some of the Class members could afford to seek legal redress for Volkswagen's misconduct.  Absent a class action, Class members will continue to incur damages, and Volkswagen's misconduct will continue without effective remedy.

119.　Class treatment in this Court, as a court with original jurisdiction over the Class claims, will conserve the resources of the courts and the litigants, and will promote consistency

and efficiency of adjudication by providing common answers to the common questions of knowledge, conduct, duty and breach, that predominate in this action.

120. Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class members to protect their interests. Class-wide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in Volkswagen's discharge of its duties to perform corrective action regarding the Class Vehicles.

## CLAIMS FOR RELIEF

### FEDERAL CLAIMS

### COUNT I
**Violations of the Federal Odometer Act**
**(49 U.S.C. §§ 32701, *et seq.*)**

121. Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

122. Plaintiffs bring this Count on behalf of the Nationwide Class against Volkswagen.

123. The Federal Odometer Act, codified in 49 U.S.C. §§ 32701-32711 (the "Odometer Act"), imposes on distributors and sellers of automobiles requirements intended to ensure that automobile consumers are provided with accurate statements of a car's mileage to prevent consumers from being defrauded about history of vehicles they are looking to purchase. In passing the Odometer Act, Congress found that "buyers of motor vehicles rely heavily on the odometer reading as an index of the condition and value of a vehicle" and Congress

concluded that "an accurate indication of the mileage assists a buyer in deciding on the safety and reliability of the vehicle." 49 U.S.C. § 32701.  The purpose of the Odometer Act is to prevent a purchaser from being misled about a vehicle's mileage "not only with respect to the actual number of miles driven, but *where* those miles were driven and *by whom*." *Owens v. Samkle Auto. Inc.*, 425 F.3d 1318, 1324 (11th Cir. 2005) (emphasis in original).

124.    Section 32705(a)(2) of the Odometer Act provides, in pertinent part, "A person transferring ownership of a motor vehicle may not ... give a false statement to the transferee in making the disclosure required by such a regulation."

125.    VWGOA qualifies as a "person transferring ownership of a motor vehicle" under the Odometer Act in connection with the sales of the Class Vehicles to Plaintiffs and the Class members.

126.    Plaintiffs R. Garcia, Jacobson, B. Garcia, and Thomson as well as other Class members against whom Volkswagen perpetrated the Odometer Fraud, are each a "transferee" of a motor vehicle within the meaning of the Odometer Act.

127.    The disclosure required by the Odometer Act regulations required VWGOA, upon applying for the original title to the Class Vehicles, to accurately set forth the actual mileage as reflected on the Odometer on the date that VWGOA made application for the original title.

128.    For substantial portion of the Class Vehicles, including the Class Vehicles purchased by Plaintiffs R. Garcia, Jacobson, B. Garcia and Thomson, VWGOA (either directly or by and through VW Credit as part of the CPO Joint Venture) falsified the mileage of the Class Vehicles in connection with the titling documents. Specifically, VWGOA (either directly or by and through VW Credit as part of the CPO Joint Venture) applied for the original

title to the Class Vehicles and lied about the mileage on the original titling documents, falsely claiming that the odometer showed only 10 miles at the time of the original title application, when in fact, the mileage on these Class Vehicles were at least several thousand miles at the time of original title application.  In this manner, VWGOA disguised the history of the Class Vehicles, as VWGOA intended to do, including: (a) hiding the fact that thousands of miles had already been driven on the Class Vehicles at the time of original titling outside of the original title-issuing state; (b) hiding the fact that the Class Vehicles were Pre-Production Cars insofar as disclosure that a substantial portion of the mileage was driven early in the year and before the release of the Series-Production Cars would have potentially revealed the status of the Class Vehicles as Pre-Series Cars or Zero-Series Cars; and (c) hiding the nature of the prior use of the Class Vehicles as Press-Fleet Cars because significant mileage driven early in the year that those vehicles were introduced to market would have been at least one indication that the Class Vehicles were part of either the Press-Fleet Cars or the Pool-Fleet Cars or both.

129.   VWGOA republished this false mileage to Plaintiffs Garcia, Jacobson, B. Garcia and Thomson and to the Class members by, *inter alia*, causing a Carfax Report to issue and to be given to Plaintiffs and Class members just prior to their purchase of a Class Vehicle. VWGOA provided this false information to Plaintiffs and the Class intending to mislead them as to the mileage history of the Class Vehicles.  By providing this false information, VWGOA intended to induce Plaintiffs and Class members to purchase a Class Vehicle that Plaintiffs and Class members would not have otherwise purchased and to pay a price for those Class Vehicles that Plaintiffs and Class members would not have otherwise paid had the truth been known.  VWGOA rigged the data that it was feeding to Carfax through its

daily file feed to eliminate mileage that was otherwise recorded in Volkswagen's system in service records for services performed by one or more of Volkswagen's dealers on the Class Vehicles prior to the date of original titling. Therefore, by manipulating the Volkswagen-Generated Vehicle History that the Defendants fed directly to Carfax and by arranging for Carfax to republish that false information in the Carfax Reports and to give that false information to potential customers immediately prior to the sale of the Class Vehicles, VWGOA ensured that its falsified odometer mileage would find its way to Plaintiffs and to the Class members at the time when Plaintiffs and Class members were deciding whether to purchase a Class Vehicle and how much to pay.

130.    Plaintiffs and the other Class Members did not become aware of the Odometer Fraud until it was discovered by Plaintiffs' counsel in January 2019, and even then, such discovery was only made possible as a result of the disclosures made by Volkswagen to the NHTSA in its Recall Report that was not filed until May 16, 2018. Given Volkswagen's affirmative efforts to hide the Odometer Fraud, Volkswagen is estopped from relying upon the two-year statute of limitations set forth in 49 U.S.C.A. § 32710(b) for bringing Odometer Act claims. Alternatively, the two-year limitations period set forth in 49 U.S.C.A. § 32710(b) did not begin to run or was otherwise tolled until the discovery of the Odometer Fraud by Plaintiffs' counsel in January 2019, or at the earliest, the date that Volkswagen filed its original Recall Report with the NHTSA on May 16, 2018. Plaintiffs could not have reasonably discovered the Odometer Fraud prior to that date.

131.    The conduct described herein by VWGOA constitutes violations of the Odometer Act committed by VWGOA with the intent to defraud. Consequently, VWGOA is liable to each Plaintiff and to each Class member against whom the Odometer Fraud was perpetrated

in an amount to be determined at trial, plus costs and reasonable attorneys' fees, pursuant to 49 U.S.C.A. § 32710. Because VWGOA's violations of the Odometer Act occurred in the course and scope of the Joint Venture, VWAG and Audi AG are jointly and severally liable for these same damages and to the same degree as VWGOA.

## COMMON LAW CLAIMS

### COUNT I
### Fraud

132.   Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

133.   Plaintiffs bring this Count on behalf of the Nationwide Class, or in the alternative, on behalf of the State Classes, against VWGOA.

134.   VWGOA made false statements of material fact to Plaintiffs and Class Members immediately prior to the time that Plaintiffs and Class Members purchased a Class Vehicle. Specifically, in the Carfax Report that VWGOA arranged to be given to each of the Plaintiffs and each of the Class Members immediately prior to the sale, VWGOA falsely represented that each Class Vehicle was a "1-Owner Vehicle" and falsely claimed, "The vehicle's retail book value plus the CARFAX Price Adjustment will give you a more accurate measure of the vehicle's value."  VWGOA knew Carfax "defines an owner as an individual or business that possesses and uses a vehicle" at the time that VWGOA provided Carfax with the vehicle history for each Class Vehicle, which falsified the number of persons that used and possessed each Class Vehicle both inside and outside of Volkswagen. For Press-Fleet Cars, at the time each of those cars were sold to Class Members as a CPO-designated vehicles, VWGOA falsely represented to the Class Members that each of those cars was a "1-Owner Vehicle" even though VWGOA knew that one or more members of

the automotive media outside of Volkswagen possessed and used those vehicles before Volkswagen attempted to sell those cars.  For the Leased-Fleet Cars, at the time each of those cars were sold to Class Members as a CPO Car, VWGOA falsely represented to the Class Members that each of those cars was a "1-Owner Vehicle" even though Volkswagen knew that multiple individuals within or outside Volkswagen possessed and used the Leased-Fleet Cars during the time that those were part of either the Pool Fleet or the Press Fleet or both, which occurred before any of those cars were leased to a single Volkswagen employee.

135.    By offering each of the Class Vehicles for sale, Volkswagen represented that each Class Vehicle was legal to sell.  Volkswagen also affirmatively represented at the time of the sale of each Class Vehicle that each Class Vehicle "conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above" which representation was made by and through the Manufacturer's Certification plate affixed to each of the Class Vehicles. By then affirmatively omitting the Alterer's Certification, VWGOA represented to Plaintiffs and Class Members that it had not altered any of the Class Vehicles from the time each of the Class Vehicles were manufactured until the time that each of the Class Vehicles were sold as a Certified Pre-Owned Car to Plaintiffs and Class Members.  These representations by VWGOA that each of the Class Vehicles had not been altered since the date of original manufacture and that the Class Vehicles were legal to sell to consumers were false at the time they were made.

136.    VWGOA furthered this fraud by making false statements of material fact regarding the vehicle mileage on the Class Vehicles as of the date of the sale by falsely claiming that a substantial portion of the Class Vehicles had only 10 miles at the time of initial titling and

registration, when in fact, those Class Vehicles had thousands of miles on the odometer at the time Volkswagen caused those vehicles to be initially titled and registered. VWGOA knowingly caused the false statement regarding the Class Vehicles' mileage as of the date of initial titling and registration to be repeated to Plaintiffs R. Garcia, Jacobson, B. Garcia and Thomson as well as to other Class Members in the Carfax Report, which was given to Plaintiffs and Class Members just prior to the time that they purchased a Class Vehicle.

137.    VWGOA made the foregoing false statements of material fact and engaged in the Odometer Fraud in an effort to induce reliance by Plaintiffs and the Class Members, all as part of an effort to sell the Class Vehicles that Volkswagen likely would not have otherwise sold or at a price that Volkswagen would not have otherwise been able to obtain for the Class Vehicles in the absence of such false statements.

138.    Plaintiffs and Class Members reasonably relied upon the foregoing false statements of material fact, including false statements made in connection with the Odometer Fraud, in purchasing the Class Vehicles, having no way of knowing of the existence of VWGOA's false statements or material omissions.

139.    Each of the foregoing false statements made by VWGOA to Plaintiffs and Class Members immediately prior to the sale of each of the Class Vehicles is, from its nature, the type of statement that would induce a reasonable buyer to purchase an automobile. In other words, a reasonable buyer of a Certified Pre-Owned Car from a Volkswagen or Audi dealership would be influenced to purchase an automobile by the representation that such vehicle is a "1-Owner Car" and by the representation that such vehicle is legal to sell. Plaintiffs and Class Members would have had no way to know that either of these representations were false at the time those representations were made, and therefore, Plaintiffs and Class

Members were forced to place their trust in VWGOA regarding the accuracy of these representations.

140.     A federal district court sitting in Virginia that exercises supplemental jurisdiction over state-law claims must look to Virginia choice-of-law rules to determine the applicable law that should govern a given state-law issue. *In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 205 (4th Cir. 1988). Virginia generally follows the traditional approach to conflicts of law as set forth in the Restatement (first) of Conflicts of Law (1934) (the "Restatement"). Section 595 of the Restatement provides, "The law of the forum governs presumptions and inferences to be drawn from evidence." The Virginia Supreme Court has explained that under Virginia law a presumption or inference of reliance arises in the following circumstances:

> When the seller has made a false representation, which, from its nature, might induce the buyer to enter into the contract on the faith of it, it will be inferred that the buyer was induced thereby to contract, and it does not rest with him to show that he, in fact, relied upon the representation. In order to displace this inference, the seller must prove either that the buyer had knowledge of facts which showed the representation to be untrue, or that he expressly stated in terms, or showed by his contract, that he did not rely upon the representation, but acted upon his own judgment.

*Wilson v. Carpenter's Administrator*, 91 Va. 183, 21 S.E. 243, 245 (Va. 1895).

141.     Given the foregoing principle, an inference of reliance by Plaintiffs and Class Members on the false statements of material fact made by Volkswagen described herein has arisen, and it is Volkswagen's burden to disprove that reliance. This inference applies irrespective of the substantive state law outside of Virginia that might otherwise provide the basis for a common-law fraud cause of action for any particular Class member who may have purchased his or her Class Vehicle in a state other than Virginia, given that the inference

of reliance is governed by Virginia law, irrespective of where the cause of action for fraud arose as to any given Class member.

142.   As a direct and proximate result of the affirmative misrepresentations set forth herein, Plaintiffs and Class Members were damaged by purchasing one or more of the Class Vehicles they would not have bought had Plaintiffs and Class Members known the truth, by overpaying for the Class Vehicles and not receiving what Plaintiffs and Class Members were promised, and by incurring other damages set forth herein or to otherwise be proven at trial, including economic damages, incidental/consequential damages, and damages relating to inconvenience, for which Plaintiffs and Class Members are entitled to recover from Volkswagen.  Alternatively, Plaintiffs and Class Members are entitled to recover from Defendants disgorgement of gross profits, without any corresponding deduction by Defendants for expenses in furthering its fraud.  Plaintiffs and Class Members are also entitled to recover pre-judgment interest, attorneys' fees and costs, expert witness fees, and such other sums as the jury may determine to be fair and just.

143.   Because VWGOA's violations of the Odometer Act occurred in the course and scope of the Joint Venture, VWAG and Audi AG are jointly and severally liable to Plaintiff and Class members for all damages recoverable for VWGOA's fraud to the same degree as VWGOA is liable.

## COUNT II
### Breach of Contract

144.   Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

145.   Plaintiffs bring this Count on behalf of the Nationwide Class, or in the alternative, on behalf of the State Classes, against VWGOA.

146.   VWGOA and Carfax executed a so-called "Agreement for Audi/Volkswagen Certified Pre-Owned Programs" (the "Carfax Contract") effective June 1, 2011 (the "Effective Date").  Carfax is a Virginia corporation with its principle place of business in Virginia. The Carfax Contract was executed by VWGOA and Carfax in Virginia and provides for the application of Virginia law. The pertinent provisions of the Carfax Contract that are relevant to the present lawsuit are accurately quoted below:

(a)   "VWGoA agrees that, commencing on the Effective Date and continuing throughout the Term, it shall require Participating AUDI/VW Dealers to run a CARFAX Report on every Certified Pre-Owned Vehicle." (Carfax Contract ¶ 3.1.)

(b)   "Commencing on the Effective Date, VWGoA agrees that AUDI/VW Certified Pre-Owned Programs policies and procedures will direct that a CARFAX Report and CARFAX Buyback Guarantee Certificate be made available by Participating AUDI/VW Dealers to the purchaser of each Certified Pre-Owned Vehicle they sell.  VWGoA agrees to maintain the AUDI/VW Certified Pre-Owned Programs' criteria to be consistent with the disqualifying records set forth in the attached Exhibit A throughout the Term."  (Carfax Contract ¶ 3.2.)

(c)   Exhibit A, entitled "Disqualifying Criteria," provides, "A vehicle is deemed ineligible for the AUDI/VW Certified Pre-Owned Programs if the CARFAX Vehicle History Report contains any of the following:
                              ***
•      Not Actual Mileage Title
                              ***
•      Manufacturer Buyback Title
                              ***
•      Potential Odometer Rollback
                              ***
•      Not Built to US Standards

(d)   "VWGOA shall provide CARFAX access to a daily data file feed, Monday thru Saturday except holidays observed by VWGoA, of the Certified Inventory, which data file shall include for each vehicle the VIN, dealer ID, retailer country (USA/CA), inspection date (date of certification/date sold [i.e. when sold as certified]), mileage on date of transaction (certified or sold) and claim status (RD3 [available for sale] or QW1 [sold]).  CARFAX may include a notation on the CARFAX Report, based on these data files, to indicate a vehicle's certified status

and such notation may become a permanent record on the applicable CARFAX Report (not including de-certification records)."   (Carfax Contract ¶ 3.4.)

(e) "VWGoA shall promote CARFAX on all AUDI/VW Certified Pre-Owned window stickers in a manner agreed upon by VWGoA and CARFAX.   In addition, VWGoA will use its reasonable best efforts to promote CARFAX on AUDI/VW Certified Pre-Owned training materials, AUDI/VW Certified Pre-Owned operations manuals, AUDI/VW Certified Pre-Owned inspection checklists, and AUDI/VW Certified Pre-Owned POP materials and displays."   (Carfax Contract ¶ 3.6.)

(f) "VWGoA will provide documentation to CARFAX correcting information when it becomes known to VWGoA (directly or through a Participating AUDI/VW Dealer) that information on a record previously provided to CARFAX was in error.   At CARFAX's reasonable request, VWGoA will provide (or work with its Participating AUDI/VW Dealers to provide) CARFAX documentation to verify a record's validity or data element accuracy with respect to vehicle history issues." (Carfax Contract ¶ 3.7.)

(g) "Each party shall comply with all federal, state and local law applicable to its obligations and activities hereunder."   (Carfax Contract ¶ 13.7.)

(h) "This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia."   (Carfax Contract ¶ 13.8.)

147.   The provisions of the Carfax Contract quoted in the paragraph above include certain terms defined as follows:

(a) "Participating AUDI/VW Dealers" means "a VWGoA-authorized dealer in the United States which participates in either or both of the AUDI/VW Certified Pre-Owned Programs."   (Carfax Contract ¶ 1.12.)

(b) "AUDI/VW Certified Pre-Owned Programs" means "the certification of vehicles under VWGoA's Certified Pre-Owned Programs" through which "VWGOA will direct authorized dealers of AUDI/VW Certified Pre-Owned Vehicles (as defined below) to generate a CARFAX Vehicle History Report." (Carfax Contract ¶ 1.1 & Preamble.)

(c) "Certified Pre-Owned Vehicle" means "an AUDI/VW vehicle that has met the requirements of and been certified under an AUDI/VW Certified Pre-Owned Program."   (Carfax Contract ¶ 1.9.)

(d) "CARFAX Report" means "a CARFAX Vehicle History Report generated through access to the CARFAX Vehicle History Service, which displays information regarding motor vehicle transactions and events, including but not limited to, titles, registrations, inspections, accidents, and service repairs, as available to CARFAX."  (Carfax Contract ¶ 1.7.)

(e) "Vehicle History Service" means "CARFAX's proprietary vehicle history service offered to consumers, automobile dealers, and others, which provides information regarding motor vehicle transactions and events from information obtained by CARFAX from various sources, as collected and maintained by CARFAX."  (Carfax Contract ¶ 1.16.)

(f) "CARFAX Buyback Guarantee" means "the title guarantee provided with a CARFAX Report as determined by CARFAX and subject to change by CARFAX from time to time."  (Carfax Contract ¶ 1.4.)

(g) "CARFAX Buyback Guarantee Certificate" means "a document, in electronic or paper form, made available by CARFAX in connection with a CARFAX Report that qualifies for the CARFAX Buyback Guarantee." (Carfax Contract ¶ 1.5.)

148. The Carfax Contract further provides, "The term of this Agreement shall commence on the Effective Date and shall continue for three (3) years (the "Initial Term"), and it shall renew automatically for additional successive one-year periods (collectively the "Term"), unless either party gives the other party written notice of its intention to cancel this Agreement thirty (30) days prior to any renewal date, or unless sooner terminated as provided below [allowable in the event of material and uncured breach after 30-days' notice by the non-breaching party, or after 90-days' notice by either party for convenience after one year from the Effective Date]."  (Carfax Contract ¶ 9.)

149. At all times from the Effective Date of the Carfax Contract on June 1, 2011 to the present, the Carfax Contract has remained in full force and effect because neither VWGOA nor Carfax have terminated the Carfax Contract in accordance with paragraph 9 of the Carfax Contract, and therefore, the Carfax Contract has automatically renewed and remained in full force and effect.

150. The Carfax Contract was made for the benefit of purchasers and prospective purchasers of VWGOA Certified Pre-Owned Vehicles, which includes the Plaintiffs as well as all Class members. The above-quoted language used in the Carfax Contract makes clear that VWGOA and Carfax intended to confer a benefit on Plaintiffs and the Class members, namely, the benefit of a CARFAX Report, the benefit of the CARFAX Buyback Guarantee and the benefit of the CARFAX Buyback Guarantee Certificate, all for which, under the terms of the Carfax Contract and the AUDI/VW Certified Pre-Owned Programs.

151. Although the Carfax Contract is not quoted in its entirety herein, and although the Carfax Contract is not attached hereto as an exhibit, no other provision of the Carfax Contract contradicts the claim that Plaintiffs and Class members were intended beneficiaries of the Carfax Contract, and no provision of the Carfax Contract otherwise disclaims or disallows third-party beneficiary status.  Consequently, Plaintiffs and Class members are third-party beneficiaries of the Carfax Contract pursuant to Virginia Code § 55-22, and Plaintiffs as well as Class members are entitled, as third-party beneficiaries, to enforce the Carfax Contract.

152. VWGOA breached paragraph 3.2 of the Carfax Contract because it failed to maintain the AUDI/VW Certified Pre-Owned Programs' consistent with the disqualifying records identified in Exhibit A of the Carfax Contract. Exhibit A of the Carfax Contract expressly provides that a vehicle is ineligible for the AUDI/VW Certified Pre-Owned Programs if the CARFAX Vehicle History Report contains any indication that the mileage listed on the title is not the vehicle's actual mileage or if the vehicle is not built to U.S. standards. Because VWGOA maintained records within its internal databases showing that the Class Vehicles were originally titled with falsified mileage and evidencing that the Class

Vehicles were not built to U.S. standards (given the material differences between the build of the Pre-Production Cars and the build of the Series-Production Cars and given the undocumented modifications made to the Class Vehicles after the date of original manufacture without the required Alterer's Certification), VWGOA was required to provide this information to Carfax. (*See* Carfax Contract ¶ 3.7.)  Had VWGOA provided this information to Carfax as it was contractually obligated to do, the CARFAX Vehicle History Report would have shown that each of the Class Vehicles was ineligible for the AUDI/VW Certified Pre-Owned Programs given the falsified mileage in the title history and given the fact that the Class Vehicles were not built to U.S. standards.

153.    These same failures by VWGOA also constitute a breach of paragraph 13.7 of the Carfax Contract, which requires VWGOA to "comply with all federal, state and local law applicable to its obligations and activities hereunder."  VWGOA violated paragraph 13.7 of the Carfax Contract by violating the Odometer Act, misrepresenting the history of the mileage of the Class Vehicles, violating the certification requirements of the Federal Safety Regulations, including the failure to include the mandatory Alterer's Certification, and otherwise misleading Plaintiffs and the Class as to the use history of the Class Vehicles by failing to identify those cars as having been part of the Press Fleet or the Pool Fleet.

154.    The Carfax Contract also contains an implied covenant of good faith and fair dealing, which arises by operation of law.  This implied covenant of good faith and fair dealing required VWGOA to act with honesty concerning the data that it provided to Carfax for purposes of the creating the CARFAX Vehicle History Report.  VWGOA breached this implied duty of good faith and fair dealing by providing false or otherwise misleading information to Carfax to be incorporated into the CARFAX Vehicle History Report,

including the falsified mileage of the Class Vehicles as of the date those cars were originally titled, the omission of the mileage at the time of the servicing of the Class Vehicles when such servicing occurred at Volkswagen and Audi authorized dealers prior to the issuance of the original title (and which mileage would have revealed the Odometer Fraud), and the omission from the Carfax Report of information that may have identified the Class Vehicles that were Pre-Series or Zero-Series or were not otherwise built to U.S. standards or properly certified for U.S. sale or resale to consumers.

155.   As a direct result of VWGOA's breaches of the Carfax Contract set forth herein, Plaintiffs and Class Members were damaged by purchasing the Class Vehicles that Plaintiffs and Class Members would not have bought had Plaintiffs and Class Members known the truth, by overpaying for the Class Vehicles and not receiving what Plaintiffs and Class Members were promised, and by incurring other damages set forth herein or to otherwise to be proven at trial, including economic damages, incidental/consequential damages, damages relating to inconvenience, and pre-judgment interest for which Plaintiffs and Class Members are entitled to recover from Volkswagen.  Plaintiffs and Class Members are further entitled to recover pre-judgment interest, and such other sums as the jury may determine to be fair and just.

## COUNT III
### Unjust Enrichment

156.   Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

157.   Plaintiffs bring this Count on behalf of the Nationwide Class and, in the alternative, on behalf of the State Classes against all Defendants.

158. Defendants have benefitted from selling the Class Vehicles which either should not have been sold at all, given the lack of proper certification of the Class Vehicles as complying with Federal Safety Standards, or should have been sold for a lesser price, given that the value of the Class Vehicles were artificially inflated by Volkswagen's affirmative false statements and material omissions as previously detailed herein.

159. Plaintiffs and Class Members conferred this benefit upon the Defendants, which the Defendants knowingly accepted under circumstances that are unjust. Defendants have received and retained these unjust benefits from the Plaintiffs and Class members, and inequity has resulted.

160. It is inequitable and unconscionable for Defendants to retain these benefits.

161. Because Volkswagen concealed its fraud and deception, Plaintiffs and Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

162. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and Class members, in an amount to be proven at trial.

## STATE LAW CLAIMS

### CALIFORNIA

### COUNT I
### Violations of the California Legal Remedies Act
### (Cal. Civ. Code § 1750 *et seq.*)

163. Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

164. Plaintiffs Hartman and Thomson bring this action on behalf of themselves and the California Class against all Defendants.

165.   Plaintiffs Hartman, Thomson and the California Class members are persons within the meaning of Cal. Civ. Code § 1761(c).

166.   Volkswagen is engaged in "transactions" within the meaning of Cal. Civ. Code § 1761(e).

167.   The California Consumers Legal Remedies Act ("California CLRA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."  Cal. Civ. Code § 1770(a).

168.   In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the concerning the Class Vehicles. Defendants accomplished this by falsifying the mileage when making application for the original title, failing to disclose the true use history of the Class Vehicles including whether the Class Vehicles were Pre-Production Cars or whether the Class Vehicles were used as part of the Press Fleet or the Pool Fleet.  The Defendants also presented the Carfax Report in a misleading way by falsely portraying Carfax as independent from Volkswagen without disclosing the true relationship, and by failing to disclose that crucial information contained within the Carfax Report was not obtained independently, but instead came directly from Volkswagen.  The Carfax Report was further misleading by labeling the Class Vehicles as "1-Owner" vehicles and seeking to charge a premium for that alleged "1-Owner" status even though the Class Vehicles did not qualify as "1-Owner" cars under the definitions set forth in the Carfax Report.  Offering any Class Vehicle for sale as a CPO-designated vehicle was also misleading given that most of the Class Vehicles are Pre-Production Cars (Pre-Series or Zero-Series) that either do not comply with Federal Safety Standards or are otherwise not properly certified as conforming to Federal Safety Standards. Volkswagen's

practice of making material modifications to the Class Vehicles after the date of manufacture without keeping track of those modifications and without providing the requisite Alterer's Certification to alert consumers that modifications that were made, is also deceptive.

169.  Volkswagen thus violated the provisions of § 1770(a) of the California CLRA, at a minimum by: (a) misrepresenting the source, sponsorship, approval, or certification of the Class Vehicles; (b)  misrepresenting the affiliation, connection, or association with, or certification by, another (c) representing that the Class Vehicles have sponsorship, approval, characteristics, uses, or benefits, which they do not have; (d) representing that the Class Vehicles are of a particular standard, quality, or grade; (e) advertising the Class Vehicles with intent not to sell them as advertised; and (f) representing that the subject of a transaction, the Class Vehicle, has been supplied in accordance with a previous representation when it has not.

170.  Volkswagen's transactions as set forth above occurred in the conduct of trade or commerce.

171.  Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs Hartman, Thomson and the California Class.

172.  Volkswagen knew or should have known that its conduct violated the California CLRA.

173.  Volkswagen owed Plaintiffs Hartman and Thomson as well as the other members of the California Class a duty to disclose the illegality of the Class Vehicles, as well as a duty to promptly disclose potential safety violations relating to the build of the Class Vehicles given that Volkswagen possessed exclusive knowledge that the Class Vehicles not comply with Federal Safety Standards and that the Class Vehicles were not otherwise properly certified in accordance with Federal Safety Standards.  Volkswagen further owed Plaintiffs

Hartman, Thomson and the California Class a duty to disclose the truth regarding the mileage history of each Class Vehicle, the use history of each Class Vehicle including whether each Class Vehicle was ever part of the Press Fleet or the Pool Fleet, and to disclose that the Class Vehicles did not qualify for CPO Car status.

174. Volkswagen's fraudulent acts, misleading statements and deceptive concealment of the true characteristics and use history of the Class Vehicles were material to Plaintiffs Hartman, Thomson and the California Class.

175. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs Hartman, Thomson and the California Class, about the legality of the Class Vehicles, the use history of the Class Vehicles, the mileage history of the Class Vehicles, the "1-Owner" status of the Class Vehicles, and the true value of the Class Vehicles.

176. Plaintiffs Hartman, Thomson and the California Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs Hartman, Thomson and the California Class members who purchased the Class Vehicles would not have purchased them at all and/or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs Hartman, Thomson and the California Class also suffered diminished value of their vehicles, as well as lost or diminished use.

177. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the California CLRA in the course of Defendants' business.

178.   Defendants' violations present a continuing risk to Plaintiffs Hartman, Thomson and the California Class and to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. To give just one example of this continuing risk, Volkswagen has yet to recall all of the dangerous Class Vehicles and has failed to even acknowledge the great danger to California motorists, including Plaintiffs Hartman, Thomson and the California Class, that has been and is continuing to be created by the Class Vehicles being driven on the road given that such vehicles were wrongfully certified as complying with Federal Safety Standards.

179.   As a result of the foregoing wrongful conduct of Defendants, Plaintiffs Hartman, Thomson and the California Class are entitled to injunctive relief and pursuant to Cal. Civ. Code § 1780, at this time, Plaintiffs Hartman, Thomson and the California Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices under the California CLRA. Plaintiffs Hartman, Thomson and the California Class, at this time, only seek injunctive relief as allowed in Cal. Civ. Code § 1782(d), as well as attorneys' fees incurred in connection with such injunctive relief as permitted by *Gonzales v. CarMax Auto Superstores, LLC*, 845 F.3d 916 (9th Cir. 2017). Plaintiffs Hartman, Thomson and the California Class do not seek damages or any other type of relief under the CPLR other than the requested injunctive relief and attorneys' fees.

## COUNT II
### Breach of the Implied Warranty of Merchantability
### (Cal. Civ. Code § 1791.1)

180.   Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

181.   Plaintiffs Hartman and Thomson bring this action on behalf of themselves and the California Class against all Defendants.

182.   The Defendants are and were at all relevant times "manufacturers" with respect to motor vehicles under Cal. Civ. Code § 1791(j) and "sellers" of motor vehicles under § 1971(l).

183.   The Class Vehicles are and were at all relevant times "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

184.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Civ. Code § 1791.1.

185.   The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.  Specifically, the Class Vehicles are inherently defective in that they either do not comply with Federal Safety Standards, or the Class Vehicles are not properly certified as complying with Federal Safety Standards or both.   Even if it could be determined that the Class Vehicles conform to Federal Safety Standards, the lack of the required certification of such conformance exists is, in-and-of-itself, a defect that makes the Class Vehicles unmerchantable and otherwise unfit for their ordinary purpose.  Without the required certification, Plaintiffs Hartman, Thomson and Class Members have no assurance that the Class Vehicles are safe for use, which could result not only in serious bodily injury or death, but also serious legal problems, including seizure of the Class Vehicles and significant monetary penalties.   Furthermore, without the requisite certification of conformance to Federal Safety Standards, the Class Vehicles cannot be sold by Plaintiffs or the Class because to do so may put the Plaintiffs and Class in serious legal jeopardy.  Similarly, the Class Vehicles cannot be legally driven in light of the absence of the required

certification of compliance with Federal Safety Standards, and if one were to take the risk of driving the Class Vehicles, should an accident occur, the discovery that the Class Vehicles were not properly certified as conforming to Federal Safety Standards could void insurance coverage on the Class Vehicles or could create other issues of liability exposure in the event that the accident were to involve any other party.

186.    As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, Plaintiffs Hartman, Thomson and the other California Class members have been damaged in an amount to be proven at trial.

**COUNT III**
**Breach of Express Warranty**
**(Cal. Civ. Code § 1791.2)**

187.    Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

188.    Plaintiffs Hartman and Thomson brings this action on behalf of themselves and the California Class against all Defendants.

189.    The Defendants are and were at all relevant times "manufacturers" with respect to motor vehicles under Cal. Civ. Code § 1791(j) and "sellers" of motor vehicles under § 1971(l).

190.    The Class Vehicles are and were at all relevant times "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

191.    For Volkswagen-branded Class Vehicles, VWAG expressly represented and thereby warrantied on the Manufacturer Certificate of Origin ("MCO"), "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL SAFETY BUMPER AND THEFT PROTECTION."  This warranty by VWAG was breached because the build of the Pre-Production Cars differs materially from the build of the Series-Production Cars, and

therefore, VWAG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as conforming to Federal Safety Standards. And because VWAG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because VWAG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the MCO by VWAG has been breached.

192.    VWAG also expressly represented and thereby warrantied on each Volkswagen-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." ("Manufacturer's Certification"). This Manufacturer's Certification was given by VWAG on a label that was affixed to the driver's door panel of each Volkswagen-branded Class Vehicle.   VWAG also breached this express warranty because the build of the Pre-Production Cars on the date of manufacture differed materially from the build of the Series-Production Cars, and therefore, VWAG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as the date of their manufacturer to claim that the Class Vehicles conform to Federal Safety Standards.  And because VWAG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because VWAG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the Manufacturer's Certification made by VWAG has been breached.

193.    For Audi-branded Class Vehicles, Audi AG expressly represented and thereby warrantied on the MCO, "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL SAFETY BUMPER AND THEFT PROTECTION." This warranty by Audi AG was

breached because the build of the Pre-Production Cars differs materially from the build of the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as conforming to Federal Safety Standards. And because Audi AG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because Audi AG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the MCO by Audi AG has been breached.

194.    Audi AG also expressly represented and thereby warrantied on each Audi-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." ("Manufacturer's Certification"). This Manufacturer's Certification was given by Audi AG on a label that was affixed to the driver's door panel of each Audi-branded Class Vehicle. Audi also breached this express warranty because the build of the Pre-Production Cars on the date of manufacture differed materially from the build of the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as the date of their manufacturer to claim that the Class Vehicles conform to Federal Safety Standards. And because Audi AG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because Audi AG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the Manufacturer's Certification made by Audi AG has been breached.

195.    VWGOA made these same express warranties when it offered the Class Vehicles for sale as CPO Cars. A vehicle cannot be a CPO Car if it does not comply with Federal Safety

Standards and if certification of that compliance is not made in accordance with applicable law. VWGOA breached its express warranty that the Class Vehicles complied with Federal Safety Standards and that the Class Vehicles were properly certified as conforming to Federal Safety Standards for the same reasons that the express warranties provided by VWAG and Audi AG were breached. In addition, VWGOA further breached this express warranty insofar as VWGOA made modifications to the Class Vehicles after the date of manufacture yet failed to document those modifications as required by law and failed to provide the Alterer's Certification. As a result, the Class Vehicles were legally prohibited from being sold, and certainly should not have been sold with CPO status. Consequently, VWGOA's express warranty that the Class Vehicles were qualified for CPO status was breached.

196.   VWGOA also warrantied, by and through the Carfax Report, that each of the Class Vehicles was a "1-Owner" car at the time that Plaintiffs Hartman, Thomson and the California Class purchased a Class Vehicle. VWGOA breached this express warranty because most of the Class Vehicles were both used and possessed by multiple individuals both within Volkswagen and outside of Volkswagen, and therefore, would not qualify as a "CARFAX 1-Owner" car as represented.

197.   The Defendants' express warranties described herein formed a basis of the bargain that was reached when Plaintiffs Hartman, Thomson and the other California Class members purchased their Class Vehicles.

198.   Affording Volkswagen a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because: Volkswagen has already admitted that the Recalled Vehicles cannot be fixed and it cannot be determined whether those Recalled

Vehicles comply with Federal Safety Standards; Volkswagen refuses to disclose the Pre-Production status of the other Class Vehicles that were not a part of the 252 Recalled Vehicles; and Volkswagen's breach of its warranties set forth in the Carfax Report result from Volkswagen's fraud, which Volkswagen has failed to acknowledge to date.

199.   Many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide an adequate remedy within a reasonable time, and any limitation on Plaintiffs Hartman's, Thomson's and the other California Class members' remedies would be insufficient to make Plaintiffs Hartman, Thomson and the other California Class members whole.

200.   Finally, because of Volkswagen's breach of warranties as set forth herein, Plaintiffs Hartman, Thomson and the other California Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs Hartman, Thomson and the other California Class members of the full purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed.

201.   Volkswagen has been provided notice of these issues by numerous Class members, and VWAG's top executives have been on notice of these problems since August 2016 when VW Germany conducted an internal audit and identified the Pre-Production Cars that have been improperly sold.

202.   As a direct and proximate result of Volkswagen's breach of express warranties Plaintiffs Hartman, Thomson and the other California Class members have been damaged in an amount to be determined at trial.

## COLORADO

## COUNT I
### Violations of the Colorado Consumer Protection Act
### (Col. Rev. Stat. 6-1-101, *et seq.*)

203.   Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

204.   Plaintiff Jacobson brings this action on behalf of himself and the Colorado Class against all Defendants.

205.   Although Jacobson purchased his CC R-Line from an authorized Volkswagen dealer located in California, Jacobson never actually entered California to make such purchase. Instead, the purchase transaction occurred by mail and the California dealer caused the CC R-Line to be delivered to Jacobson in Colorado. To the best of Jacobson's recollection, he was the last party to sign the purchase documents to memorialize the sale of the CC R-Line, which occurred in Colorado.  Jacobson first incurred injury in Colorado relating to the misconduct by Volkswagen described herein.  Since the time of the purchase of the CC R-Line until the present, Jacobson has been and continues to be a Colorado citizen and resident. Given the foregoing, Colorado law governs the state-law claims that Jacobson is pursuing against Volkswagen as will be asserted hereinafter.

206.   The Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq.* prohibits deceptive trade practices in the course of a person's business.

207.   Defendants are "person[s]" under § 6-1-102(6) of the Colorado CPA.

208.    Plaintiff Jacobson and Colorado Class members are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a) who purchased one or more Class Vehicles.

209.    Volkswagen engaged in deceptive trade practices prohibited by the Colorado CPA, including: (a) knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles that had the capacity or tendency to deceive Colorado Class members; (b) representing that the Class Vehicles are of a particular standard, quality, and grade even though Volkswagen knew or should have known they are not; (c) advertising the Class Vehicles with the intent not to sell them as advertised; and (d) failing to disclose material information concerning the Class Vehicles that was known to Volkswagen at the time of advertisement or sale with the intent to induce Colorado Class members to purchase the Class Vehicles.

210.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by falsifying the mileage when making application for the original title, failing to disclose the true use history of the Class Vehicles including whether the Class Vehicles were Pre-Production Cars or whether the Class Vehicles were used as part of the Press Fleet or the Pool Fleet.  The Defendants also presented the Carfax Report in a misleading way by falsely portraying Carfax as independent from Volkswagen without disclosing the true relationship, and by failing to disclose that crucial information contained within the Carfax Report was not obtained independently, but instead came directly from Volkswagen.  The Carfax Report was further misleading by labeling the Class Vehicles as "1-Owner" vehicles and seeking to charge a premium for that alleged "1-Owner" status even though the Class Vehicles did not qualify as "1-Owner" cars under the definitions set forth in the Carfax Report.  Offering any Class

Vehicle for sale as a CPO-designated vehicle was also misleading given that most of the Class Vehicles are Pre-Production Cars (Pre-Series or Zero-Series) that either do not comply with Federal Safety Standards or are otherwise not properly certified as conforming to Federal Safety Standards. Volkswagen's practice of making material modifications to the Class Vehicles after the date of manufacture without keeping track of those modifications and without providing the requisite Alterer's Certification to alert consumers that modifications that were made, is also deceptive.

211.    Defendants thus violated the Colorado CPA by, at minimum: employing deception, engaging in deceptive acts or practices, fraud, misrepresentations, concealment, suppression and omission of material fact with intent that others rely upon such concealment, suppression or omission, which misconduct occurred in connection with the sale of Class Vehicles.

212.    Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

213.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff Jacobson and the Colorado Class.

214.    Volkswagen knew or should have known that its conduct violated the Colorado CPA.

215.    Volkswagen owed Plaintiff Jacobson as well as the other members of the Colorado Class a duty to disclose the illegality of the Class Vehicles, as well as a duty to promptly disclose potential safety violations relating to the build of the Class Vehicles given that Volkswagen possessed exclusive knowledge that the Class Vehicles do not comply with Federal Safety Standards and that the Class Vehicles were not otherwise properly certified in accordance with Federal Safety Standards.  Volkswagen further owed Plaintiff Jacobson and the Colorado Class a duty to disclose the truth regarding the mileage history of each Class

Vehicle, the use history of each Class Vehicle including whether each Class Vehicle was ever part of the Press Fleet or the Pool Fleet, and to disclose that the Class Vehicles did not qualify for CPO Car status.

216.   Volkswagen's fraudulent acts, misleading statements and deceptive concealment of the true characteristics and use history of the Class Vehicles were material to Plaintiff Jacobson and the Colorado Class.

217.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Jacobson and the Colorado Class, about the legality of the Class Vehicles, the use history of the Class Vehicles, the mileage history of the Class Vehicles,  the "1-Owner" status of the Class Vehicles, and the true value of the Class Vehicles.

218.   Plaintiff Jacobson and the Colorado Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiff Jacobson and the Colorado Class members who purchased the Class Vehicles would not have purchased them at all and/or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiff Jacobson and the Colorado Class also suffered diminished value of their vehicles, as well as lost or diminished use.

219.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Colorado CPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of

Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

220.   Plaintiff Jacobson and Colorado Class members risk irreparable injury as a result of Volkswagen's acts and omissions in violation of the Colorado CPA, and these violations present a continuing risk to Plaintiff Jacobson as well as to the Colorado Class and to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. To give just one example of this continuing risk, Volkswagen has yet to recall all of the dangerous Class Vehicles and has failed to even acknowledge the great danger to Colorado motorists, including Plaintiff Jacobson and the Colorado Class, that has been and is continuing to be created by the Class Vehicles being driven on the road given that such vehicles were wrongfully certified as complying with Federal Safety Standards.

221.   Defendants' unlawful acts and practices complained of herein affect the public interest.

222.   As a direct and proximate result of Defendants' violations of the Colorado CPA, Plaintiff Jacobson and the Colorado Class have suffered injury-in-fact and/or actual damage.

223.    Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff Jacobson, individually and on behalf of the Colorado Class, seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, or (b) statutory damages in the amount of $500 for each Plaintiff and each Colorado Class member.

224.   Plaintiff Jacobson and the Colorado Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

**COUNT II**
**Breach of the Implied Warranty of Merchantability**
**(Col. Rev. Stat. § 4-2-314)**

225.   Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

226.   Plaintiff Jacobson brings this Count on behalf of the Colorado Class, against all Defendants.

227.   The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

228.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1).

229.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Colo. Rev. Stat. § 4-2-314.

230.   The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.  Specifically, the Class Vehicles are inherently defective in that they either do not comply with Federal Safety Standards, or the Class Vehicles are not properly certified as complying with Federal Safety Standards or both.   Even if it could be determined that the Class Vehicles conform to Federal Safety Standards, the lack of the required certification of such conformance exists is, in-and-of-itself, a defect that makes the Class Vehicles unmerchantable and otherwise unfit for their ordinary purpose.  Without the required certification, Plaintiff Jacobson and Class Members have no assurance that the Class Vehicles are safe for use, which could result not only in serious bodily injury or death, but also serious legal problems, including seizure of the Class Vehicles and significant

monetary penalties.  Furthermore, without the requisite certification of conformance to Federal Safety Standards, the Class Vehicles cannot be sold by Plaintiffs or the Class because to do so may put the Plaintiffs and Class in serious legal jeopardy.  Similarly, the Class Vehicles cannot be legally driven in light of the absence of the required certification of compliance with Federal Safety Standards, and if one were to take the risk of driving the Class Vehicles, should an accident occur, the discovery that the Class Vehicles were not properly certified as conforming to Federal Safety Standards could void insurance coverage on the Class Vehicles, or could create other issues of liability exposure in the event that the accident were to involve any other party.

231.    As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, Plaintiff Jacobson and the other Colorado Class members have been damaged in an amount to be proven at trial.

### COUNT III
### Breach of Express Warranty
### (Col. Rev. Stat. § 4-2-313)

232.    Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

233.    Plaintiff Jacobson brings this Count on behalf of the Colorado Class, against all Defendants.

234.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and "sellers" of motor vehicles under § 4-2-103(1)(d).

235.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1).

236.    For Volkswagen-branded Class Vehicles, VWAG expressly represented and thereby warrantied in the Manufacturer Certificate of Origin ("MCO"), "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL SAFETY BUMPER AND THEFT PROTECTION." This warranty by VWAG was breached because the build of the Pre-Production Cars differs materially from the build of the Series-Production Cars, and therefore, VWAG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as conforming to Federal Safety Standards. And because VWAG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because VWAG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the MCO by VWAG has been breached.

237.    VWAG also expressly represented and thereby warrantied on each Volkswagen-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." ("Manufacturer's Certification"). This Manufacturer's Certification was given by VWAG on a label that was affixed to the driver's door panel of each Volkswagen-branded Class Vehicle.  VWAG also breached this express warranty because the build of the Pre-Production Cars on the date of manufacture differed materially from the build of the Series-Production Cars, and therefore, VWAG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as the date of their manufacture to claim that the Class Vehicles conform to Federal Safety Standards.  And because VWAG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because VWAG has not otherwise provided a legally

compliant certification in that regard, the warranty set forth in the Manufacturer's Certification made by VWAG has been breached.

238.    For Audi-branded Class Vehicles, Audi AG expressly represented and thereby warrantied on the MCO, "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL SAFETY BUMPER AND THEFT PROTECTION." This warranty by Audi AG was breached because the build of the Pre-Production Cars differs materially from the build of the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as conforming to Federal Safety Standards. And because Audi AG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because Audi AG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the MCO by Audi AG has been breached.

239.    Audi AG also expressly represented and thereby warrantied on each Audi-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." ("Manufacturer's Certification"). This Manufacturer's Certification was given by Audi AG on a label that was affixed to the driver's door panel of each Audi-branded Class Vehicle. Audi also breached this express warranty because the build of the Pre-Production Cars on the date of manufacture differed materially from the build of the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as the date of their manufacture to claim that the Class Vehicles conform to Federal Safety Standards. And because Audi AG has not separately tested and determined that the Class Vehicles comply with Federal Safety

Standards, and because Audi AG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the Manufacturer's Certification made by Audi AG has been breached.

240.    VWGOA made these same express warranties when it offered the Class Vehicles for sale as CPO Cars.  A vehicle cannot be a CPO Car if it does not comply with Federal Safety Standards and if certification of that compliance is not made in accordance with applicable law.  VWGOA breached its express warranty that the Class Vehicles complied with Federal Safety Standards and that the Class Vehicles were properly certified as conforming to Federal Safety Standards for the same reasons that the express warranties provided by VWAG and Audi AG were breached.  In addition, VWGOA further breached this express warranty insofar as VWGOA made modifications to the Class Vehicles after the date of manufacture yet failed to document those modifications as required by law and failed to provide the Alterer's Certification.  As a result, the Class Vehicles were legally prohibited from being sold, and certainly should not have been sold with CPO status.  Consequently, VWGOA's express warranty that the Class Vehicles were qualified for CPO status was breached.

241.    VWGOA also warrantied, by and through the Carfax Report, that each of the Class Vehicles was a "1-Owner" car at the time that Plaintiff Jacobson and the Colorado Class purchased a Class Vehicle.  VWGOA breached this express warranty because most of the Class Vehicles were both used and possessed by multiple individuals both within Volkswagen and outside of Volkswagen, and therefore, would not qualify as a "CARFAX 1-Owner" car as represented.

242. The Defendants' express warranties described herein formed a basis of the bargain that was reached when Plaintiff Jacobson and the other Colorado Class members purchased their Class Vehicles.

243. Affording Volkswagen a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because: Volkswagen has already admitted that the Recalled Vehicles cannot be fixed and it cannot be determined whether those Recalled Vehicles comply with Federal Safety Standards; Volkswagen refuses to disclose the Pre-Production status of the other Class Vehicles that were not a part of the 252 Recalled Vehicles; and Volkswagen's breach of its warranties set forth in the Carfax Report result from Volkswagen's fraud, which Volkswagen has failed to acknowledge to date.

244. Many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide an adequate remedy within a reasonable time, and any limitation on Plaintiff Jacobson's and the other Colorado Class members' remedies would be insufficient to make Plaintiff Jacobson and the other Colorado Class members whole.

245. Finally, because of Volkswagen's breach of warranties as set forth herein, Plaintiff Jacobson and the other Colorado Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Jacobson and the other Colorado Class members of the full purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed.

246.   Volkswagen has been provided notice of these issues by numerous Class members, and VWAG's top executives have been on notice of these problems since August 2016 when VW Germany conducted an internal audit and identified the Pre-Production Cars that have been improperly sold.

247.   As a direct and proximate result of Volkswagen's breach of express warranties, Plaintiff Jacobson and the other Colorado Class members have been damaged in an amount to be determined at trial.

## FLORIDA

## COUNT I
### Violations of the Florida Deceptive and Unfair Trade Practices Act
### (Fla. Stat. § 501.201 *et seq*.)

248.   Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

249.   Plaintiffs Holovatyuk and B. Garcia bring this action on behalf of themselves and the Florida Class against all Defendants.

250.   Plaintiffs Holovatyuk, B. Garcia and the Florida Class members are persons within the meaning of Fla. Stat. § 501.203(6).

251.   Volkswagen is engaged in "trade" or "commerce" within the meaning of Fla. Stat. § 501.203(8).

252.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

253.   In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the concerning the Class Vehicles.

Defendants accomplished this by falsifying the mileage when making application for the original title, failing to disclose the true use history of the Class Vehicles including whether the Class Vehicles were Pre-Production Cars or whether the Class Vehicles were used as part of the Press Fleet or the Pool Fleet.  The Defendants also presented the Carfax Report in a misleading way by falsely portraying Carfax as independent from Volkswagen without disclosing the true relationship, and by failing to disclose that crucial information contained within the Carfax Report was not obtained independently, but instead came directly from Volkswagen.  The Carfax Report was further misleading by labeling the Class Vehicles as "1-Owner" vehicles and seeking to charge a premium for that alleged "1-Owner" status even though the Class Vehicles did not qualify as "1-Owner" cars under the definitions set forth in the Carfax Report.  Offering any Class Vehicle for sale as a CPO-designated vehicle was also misleading given that most of the Class Vehicles are Pre-Production Cars (Pre-Series or Zero-Series) that either do not comply with Federal Safety Standards or are otherwise not properly certified as conforming to Federal Safety Standards. Volkswagen's practice of making material modifications to the Class Vehicles after the date of manufacture without keeping track of those modifications and without providing the requisite Alterer's Certification to alert consumers that modifications that were made, is also deceptive.

254.    Volkswagen thus violated the provisions of the FDUTPA, at a minimum by: (a) making direct statements or causing reasonable inferences about the Class Vehicles that had the tendency to mislead; (b)  engaging in advertising concerning the CPO status of the Class Vehicles even though the Class Vehicles were and are ineligible for such status under Volkswagen own internal rules and under the limitations placed on vehicles that qualify

for CPO status as set forth in the Carfax Contract; and (c) failing to make clear and conspicuous disclosures of limitations, disclaimers, qualifications, conditions, exclusions or restrictions of the Class Vehicles.

255. Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

256. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs Holovatyuk, B. Garcia and the Florida Class.

257. Volkswagen knew or should have known that its conduct violated the FDUTPA.

258. Volkswagen owed Plaintiffs Holovatyuk and B. Garcia as well as the other members of the Florida Class a duty to disclose the illegality of the Class Vehicles, as well as a duty to promptly disclose potential safety violations relating to the build of the Class Vehicles given that Volkswagen possessed exclusive knowledge that the Class Vehicles not comply with Federal Safety Standards and that the Class Vehicles were not otherwise properly certified in accordance with Federal Safety Standards.  Volkswagen further owed Plaintiffs Holovatyuk, B. Garcia and the Florida Class a duty to disclose the truth regarding the mileage history of each Class Vehicle, the use history of each Class Vehicle including whether each Class Vehicle was ever part of the Press Fleet or the Pool Fleet, and to disclose that the Class Vehicles did not qualify for CPO Car status.

259. Volkswagen's fraudulent acts, misleading statements and deceptive concealment of the true characteristics and use history of the Class Vehicles were material to Plaintiffs Holovatyuk, B. Garcia and the Florida Class.

260. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs Holovatyuk, B. Garcia and the Florida Class, about the legality of the Class Vehicles, the use history of the Class Vehicles, the mileage

history of the Class Vehicles, the "1-Owner" status of the Class Vehicles, and the true value of the Class Vehicles.

261.  Plaintiffs Holovatyuk, B. Garcia and the Florida Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs Holovatyuk, B. Garcia and the Florida Class members who purchased the Class Vehicles would not have purchased them at all and/or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs Holovatyuk, B. Garcia and the Florida Class also suffered diminished value of their vehicles, as well as lost or diminished use.

262.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the FDUTPA in the course of Defendants' business.

263.  Defendants' violations present a continuing risk to Plaintiffs Holovatyuk, B. Garcia and the Florida Class and to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. To give just one example of this continuing risk, Volkswagen has yet to recall all of the dangerous Class Vehicles and has failed to even acknowledge the great danger to Florida motorists, including Plaintiffs Holovatyuk, B. Garcia and the Florida Class, that has been and is continuing to be created by the Class Vehicles being driven on the road given that such vehicles were wrongfully certified as complying with Federal Safety Standards.

264.  As a result of the foregoing wrongful conduct of Defendants, Plaintiffs Holovatyuk, B. Garcia and the Florida Class have been damaged in an amount to be proven at trial. Pursuant to Fla. Stat. § 501.2105 and 501.211, Plaintiffs Holovatyuk, B. Garcia and the

Florida Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, and attorneys' fees, costs, and any other just and proper relief available under the FDUTPA.

## COUNT II
### Breach of the Implied Warranty of Merchantability
### (Fla. Stat. § 672.314)

265.  Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

266.  Plaintiffs Holovatyuk and B. Garcia bring this action on behalf of themselves and the Florida Class against all Defendants.

267.  The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Fla. Stat. § 672.104 and "sellers" of motor vehicles under § 672.103(d).

268.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. § 672.105.

269.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Fla. Stat. § 672.314.

270.  The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.  Specifically, the Class Vehicles are inherently defective in that they either do not comply with Federal Safety Standards, or the Class Vehicles are not properly certified as complying with Federal Safety Standards or both.   Even if it could be determined that the Class Vehicles conform to Federal Safety Standards, the lack of the required certification of such conformance exists is, in-and-of-itself, a defect that makes the Class Vehicles unmerchantable and otherwise unfit for their ordinary purpose.   Without the required

certification, Plaintiffs Holovatyuk, B. Garcia and Class Members have no assurance that the Class Vehicles are safe for use, which could result not only in serious bodily injury or death, but also serious legal problems, including seizure of the Class Vehicles and significant monetary penalties.   Furthermore, without the requisite certification of conformance to Federal Safety Standards, the Class Vehicles cannot be sold by Plaintiffs or the Class because to do so may put the Plaintiffs and Class in serious legal jeopardy. Similarly, the Class Vehicles cannot be legally driven in light of the absence of the required certification of compliance with Federal Safety Standards, and if one were to take the risk of driving the Class Vehicles, should an accident occur, the discovery that the Class Vehicles were not properly certified as conforming to Federal Safety Standards could void insurance coverage on the Class Vehicles or could create other issues of liability exposure in the event that the accident were to involve any other party.

271.   As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, Plaintiffs Holovatyuk, B. Garcia and the other Florida Class members have been damaged in an amount to be proven at trial.

## COUNT III
### Breach of Express Warranty
### (Fla. Stat. § 762.313)

272.   Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

273.   Plaintiffs Holovatyuk and B. Garcia brings this action on behalf of themselves and the Florida Class against all Defendants.

274.   The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Fla. Stat. § 672.104 and "sellers" of motor vehicles under § 672.103(d).

275.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. § 672.105.

276.   For Volkswagen-branded Class Vehicles, VWAG expressly represented and thereby warrantied on the Manufacturer Certificate of Origin ("MCO"), "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL SAFETY BUMPER AND THEFT PROTECTION."  This warranty by VWAG was breached because the build of the Pre-Production Cars differs materially from the build of the Series-Production Cars, and therefore, VWAG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as conforming to Federal Safety Standards. And because VWAG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because VWAG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the MCO by VWAG has been breached.

277.   VWAG also expressly represented and thereby warrantied on each Volkswagen-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety,

bumper, and theft prevention standards in effect on the date of manufacture shown above."
("Manufacturer's Certification"). This Manufacturer's Certification was given by VWAG
on a label that was affixed to the driver's door panel of each Volkswagen-branded Class
Vehicle. VWAG also breached this express warranty because the build of the Pre-
Production Cars on the date of manufacture differed materially from the build of the Series-
Production Cars, and therefore, VWAG cannot legally rely upon the certification of the
Series-Production Cars to certify the build of the Pre-Production Cars as the date of their
manufacturer to claim that the Class Vehicles conform to Federal Safety Standards. And
because VWAG has not separately tested and determined that the Class Vehicles comply
with Federal Safety Standards, and because VWAG has not otherwise provided a legally
compliant certification in that regard, the warranty set forth in the Manufacturer's
Certification made by VWAG has been breached.

278.  For Audi-branded Class Vehicles, Audi AG expressly represented and thereby warrantied
on the MCO, "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL
SAFETY BUMPER AND THEFT PROTECTION." This warranty by Audi AG was
breached because the build of the Pre-Production Cars differs materially from the build of
the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the
certification of the Series-Production Cars to certify the build of the Pre-Production Cars
as conforming to Federal Safety Standards. And because Audi AG has not separately tested
and determined that the Class Vehicles comply with Federal Safety Standards, and because
Audi AG has not otherwise provided a legally compliant certification in that regard, the
warranty set forth in the MCO by Audi AG has been breached.

279.   Audi AG also expressly represented and thereby warrantied on each Audi-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." ("Manufacturer's Certification"). This Manufacturer's Certification was given by Audi AG on a label that was affixed to the driver's door panel of each Audi-branded Class Vehicle. Audi also breached this express warranty because the build of the Pre-Production Cars on the date of manufacture differed materially from the build of the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as the date of their manufacturer to claim that the Class Vehicles conform to Federal Safety Standards.  And because Audi AG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because Audi AG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the Manufacturer's Certification made by Audi AG has been breached.

280.   VWGOA made these same express warranties when it offered the Class Vehicles for sale as CPO Cars.  A vehicle cannot be a CPO Car if it does not comply with Federal Safety Standards and if certification of that compliance is not made in accordance with applicable law.  VWGOA breached its express warranty that the Class Vehicles complied with Federal Safety Standards and that the Class Vehicles were properly certified as conforming to Federal Safety Standards for the same reasons that the express warranties provided by VWAG and Audi AG were breached.  In addition, VWGOA further breached this express warranty insofar as VWGOA made modifications to the Class Vehicles after the date of manufacture yet failed to document those modifications as required by law and failed to

provide the Alterer's Certification.  As a result, the Class Vehicles were legally prohibited from being sold, and certainly should not have been sold with CPO status.  Consequently, VWGOA's express warranty that the Class Vehicles were qualified for CPO status was breached.

281.   VWGOA also warrantied, by and through the Carfax Report, that each of the Class Vehicles was a "1-Owner" car at the time that Plaintiffs Holovatyuk, B. Garcia and the Florida Class purchased a Class Vehicle.  VWGOA breached this express warranty because most of the Class Vehicles were both used and possessed by multiple individuals both within Volkswagen and outside of Volkswagen, and therefore, would not qualify as a "CARFAX 1-Owner" car as represented.

282.   The Defendants' express warranties described herein formed a basis of the bargain that was reached when Plaintiffs Holovatyuk, B. Garcia and the other Florida Class members purchased their Class Vehicles.

283.   Affording Volkswagen a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because: Volkswagen has already admitted that the Recalled Vehicles cannot be fixed and it cannot be determined whether those Recalled Vehicles comply with Federal Safety Standards; Volkswagen refuses to disclose the Pre-Production status of the other Class Vehicles that were not a part of the 252 Recalled Vehicles; and Volkswagen's breach of its warranties set forth in the Carfax Report result from Volkswagen's fraud, which Volkswagen has failed to acknowledge to date.

284.   Many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as

alleged herein, and because of its failure and/or continued failure to provide an adequate remedy within a reasonable time, and any limitation on Plaintiffs Holovatyuk's, B. Garcia's and the other Florida Class members' remedies would be insufficient to make Plaintiffs Holovatyuk, B. Garcia and the other Florida Class members whole.

285. Finally, because of Volkswagen's breach of warranties as set forth herein, Plaintiffs Holovatyuk, B. Garcia and the other Florida Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs Holovatyuk, B. Garcia and the other Florida Class members of the full purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed.

286. Volkswagen has been provided notice of these issues by numerous Class members, and VWAG's top executives have been on notice of these problems since August 2016 when VW Germany conducted an internal audit and identified the Pre-Production Cars that have been improperly sold.

287. As a direct and proximate result of Volkswagen's breach of express warranties, Plaintiffs Holovatyuk, B. Garcia and the other Florida Class members have been damaged in an amount to be determined at trial.

## ILLINOIS

## <u>COUNT I</u>
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 Ill. Comp. Stat. § 505 *et seq*.)**

288. Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

289.   Plaintiff Calise brings this action on behalf of himself and the Illinois Class against all Defendants.

290.   Plaintiff Calise and the Illinois Class members and Defendants are persons within the meaning of 815 Ill. Comp. Stat. § 505/1(c).

291.   Volkswagen is engaged in "trade" or "commerce" within the meaning of 815 Ill. Comp. Stat. § 505/1(f).

292.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices … in the conduct of any trade or commerce."  815 Ill. Comp. Stat. § 505/2.

293.   In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the concerning the Class Vehicles. Defendants accomplished this by falsifying the mileage when making application for the original title, failing to disclose the true use history of the Class Vehicles including whether the Class Vehicles were Pre-Production Cars or whether the Class Vehicles were used as part of the Press Fleet or the Pool Fleet.  The Defendants also presented the Carfax Report in a misleading way by falsely portraying Carfax as independent from Volkswagen without disclosing the true relationship, and by failing to disclose that crucial information contained within the Carfax Report was not obtained independently, but instead came directly from Volkswagen.  The Carfax Report was further misleading by labeling the Class Vehicles as "1-Owner" vehicles and seeking to charge a premium for that alleged "1-Owner" status even though the Class Vehicles did not qualify as "1-Owner" cars under the definitions set forth in the Carfax Report.  Offering any Class Vehicle for sale as a CPO-designated vehicle was also misleading given that most of the Class Vehicles are Pre-Production Cars

(Pre-Series or Zero-Series) that either do not comply with Federal Safety Standards or are otherwise not properly certified as conforming to Federal Safety Standards. Volkswagen's practice of making material modifications to the Class Vehicles after the date of manufacture without keeping track of those modifications and without providing the requisite Alterer's Certification to alert consumers that modifications that were made, is also deceptive.

294. Volkswagen thus violated the provisions of the Illinois CFA, at a minimum by: (a) making direct statements or causing reasonable inferences about the Class Vehicles that had the tendency to mislead; (b) engaging in advertising concerning the CPO status of the Class Vehicles even though the Class Vehicles were and are ineligible for such status under Volkswagen own internal rules and under the limitations placed on vehicles that qualify for CPO status as set forth in the Carfax Contract; and (c) failing to make clear and conspicuous disclosures of limitations, disclaimers, qualifications, conditions, exclusions or restrictions of the Class Vehicles.

295. Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

296. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff Calise and the Illinois Class.

297. Volkswagen knew or should have known that its conduct violated the Illinois CFA.

298. Volkswagen owed Plaintiff Calise as well as the other members of the Illinois Class a duty to disclose the illegality of the Class Vehicles, as well as a duty to promptly disclose potential safety violations relating to the build of the Class Vehicles given that Volkswagen possessed exclusive knowledge that the Class Vehicles not comply with Federal Safety Standards and that the Class Vehicles were not otherwise properly certified in accordance

with Federal Safety Standards.  Volkswagen further owed Plaintiff Calise and the Illinois Class a duty to disclose the truth regarding the mileage history of each Class Vehicle, the use history of each Class Vehicle including whether each Class Vehicle was ever part of the Press Fleet or the Pool Fleet, and to disclose that the Class Vehicles did not qualify for CPO Car status.

299.     Volkswagen's fraudulent acts, misleading statements and deceptive concealment of the true characteristics and use history of the Class Vehicles were material to Plaintiff Calise and the Illinois Class.

300.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Calise and the Illinois Class, about the legality of the Class Vehicles, the use history of the Class Vehicles, the mileage history of the Class Vehicles, the "1-Owner" status of the Class Vehicles, and the true value of the Class Vehicles.

301.     Plaintiff Calise and the Illinois Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiff Calise and the Illinois Class members who purchased the Class Vehicles would not have purchased them at all and/or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiff Calise and the Illinois Class also suffered diminished value of their vehicles, as well as lost or diminished use.

302.     Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Illinois CFA in the course of Defendants' business.

303. Defendants' violations present a continuing risk to Plaintiff Calise and the Illinois Class and to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. To give just one example of this continuing risk, Volkswagen has yet to recall all of the dangerous Class Vehicles and has failed to even acknowledge the great danger to Illinois motorists, including Plaintiff Calise and the Illinois Class, that has been and is continuing to be created by the Class Vehicles being driven on the road given that such vehicles were wrongfully certified as complying with Federal Safety Standards.

304. As a result of the foregoing wrongful conduct of Defendants, Plaintiff Calise and the Illinois Class have been damaged in an amount to be proven at trial. Pursuant to 815 Ill. Comp. Stat. § 505/10a, Plaintiff Calise and the Illinois Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, attorneys' fees, costs, and any other just and proper relief available under the Illinois CFA.

## COUNT II
### Breach of the Implied Warranty of Merchantability
### (810 Ill. Comp. Stat. § 5/2-314)

305. Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

306. Plaintiff Calise brings this action on behalf of himself and the Illinois Class against all Defendants.

307. The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. § 5/2-104 and "sellers" of motor vehicles under § 5/2-103(d).

308. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. § 5/2-105(1).

309.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat. § 5/2-314.

310.   The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.  Specifically, the Class Vehicles are inherently defective in that they either do not comply with Federal Safety Standards, or the Class Vehicles are not properly certified as complying with Federal Safety Standards or both.   Even if it could be determined that the Class Vehicles conform to Federal Safety Standards, the lack of the required certification of such conformance exists is, in-and-of-itself, a defect that makes the Class Vehicles unmerchantable and otherwise unfit for their ordinary purpose.  Without the required certification, Plaintiff Calise and Class Members have no assurance that the Class Vehicles are safe for use, which could result not only in serious bodily injury or death, but also serious legal problems, including seizure of the Class Vehicles and significant monetary penalties.  Furthermore, without the requisite certification of conformance to Federal Safety Standards, the Class Vehicles cannot be sold by Plaintiffs or the Class because to do so may put the Plaintiffs and Class in serious legal jeopardy.  Similarly, the Class Vehicles cannot be legally driven in light of the absence of the required certification of compliance with Federal Safety Standards, and if one were to take the risk of driving the Class Vehicles, should an accident occur, the discovery that the Class Vehicles were not properly certified as conforming to Federal Safety Standards could void insurance coverage on the Class Vehicles or could create other issues of liability exposure in the event that the accident were to involve any other party.

311.   As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, Plaintiff Calise and the other Illinois Class members have been damaged in an amount to be proven at trial.

## COUNT III
### Breach of Express Warranty
### (810 Ill. Comp. Stat. § 5/2-313)

312.   Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

313.   Plaintiff Calise brings this action on behalf of himself and the Illinois Class against all Defendants.

314.   The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. § 5/2-104 and "sellers" of motor vehicles under § 5/2-103(d).

315.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. § 5/2-105(1).

316.   For Volkswagen-branded Class Vehicles, VWAG expressly represented and thereby warrantied on the Manufacturer Certificate of Origin ("MCO"), "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL SAFETY BUMPER AND THEFT PROTECTION."  This warranty by VWAG was breached because the build of the Pre-Production Cars differs materially from the build of the Series-Production Cars, and therefore, VWAG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as conforming to Federal Safety Standards. And because VWAG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because VWAG has not otherwise provided a

legally compliant certification in that regard, the warranty set forth in the MCO by VWAG has been breached.

317.   VWAG also expressly represented and thereby warrantied on each Volkswagen-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." ("Manufacturer's Certification"). This Manufacturer's Certification was given by VWAG on a label that was affixed to the driver's door panel of each Volkswagen-branded Class Vehicle.   VWAG also breached this express warranty because the build of the Pre-Production Cars on the date of manufacture differed materially from the build of the Series-Production Cars, and therefore, VWAG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as the date of their manufacturer to claim that the Class Vehicles conform to Federal Safety Standards.   And because VWAG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because VWAG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the Manufacturer's Certification made by VWAG has been breached.

318.   For Audi-branded Class Vehicles, Audi AG expressly represented and thereby warrantied on the MCO, "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL SAFETY BUMPER AND THEFT PROTECTION." This warranty by Audi AG was breached because the build of the Pre-Production Cars differs materially from the build of the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as conforming to Federal Safety Standards.   And because Audi AG has not separately tested

and determined that the Class Vehicles comply with Federal Safety Standards, and because Audi AG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the MCO by Audi AG has been breached.

319.    Audi AG also expressly represented and thereby warrantied on each Audi-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." ("Manufacturer's Certification"). This Manufacturer's Certification was given by Audi AG on a label that was affixed to the driver's door panel of each Audi-branded Class Vehicle. Audi also breached this express warranty because the build of the Pre-Production Cars on the date of manufacture differed materially from the build of the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as the date of their manufacturer to claim that the Class Vehicles conform to Federal Safety Standards.  And because Audi AG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because Audi AG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the Manufacturer's Certification made by Audi AG has been breached.

320.    VWGOA made these same express warranties when it offered the Class Vehicles for sale as CPO Cars.  A vehicle cannot be a CPO Car if it does not comply with Federal Safety Standards and if certification of that compliance is not made in accordance with applicable law.  VWGOA breached its express warranty that the Class Vehicles complied with Federal Safety Standards and that the Class Vehicles were properly certified as conforming to Federal Safety Standards for the same reasons that the express warranties provided by

VWAG and Audi AG were breached.  In addition, VWGOA further breached this express warranty insofar as VWGOA made modifications to the Class Vehicles after the date of manufacture yet failed to document those modifications as required by law and failed to provide the Alterer's Certification.  As a result, the Class Vehicles were legally prohibited from being sold, and certainly should not have been sold with CPO status.  Consequently, VWGOA's express warranty that the Class Vehicles were qualified for CPO status was breached.

321.   VWGOA also warrantied, by and through the Carfax Report, that each of the Class Vehicles was a "1-Owner" car at the time that Plaintiff Calise and the Illinois Class purchased a Class Vehicle.  VWGOA breached this express warranty because most of the Class Vehicles were both used and possessed by multiple individuals both within Volkswagen and outside of Volkswagen, and therefore, would not qualify as a "CARFAX 1-Owner" car as represented.

322.   The Defendants' express warranties described herein formed a basis of the bargain that was reached when Plaintiff Calise and the other Illinois Class members purchased their Class Vehicles.

323.   Affording Volkswagen a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because: Volkswagen has already admitted that the Recalled Vehicles cannot be fixed and it cannot be determined whether those Recalled Vehicles comply with Federal Safety Standards; Volkswagen refuses to disclose the Pre-Production status of the other Class Vehicles that were not a part of the 252 Recalled Vehicles; and Volkswagen's breach of its warranties set forth in the Carfax Report result from Volkswagen's fraud, which Volkswagen has failed to acknowledge to date.

324.   Many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide an adequate remedy within a reasonable time, and any limitation on Plaintiff Calise's and the other Illinois Class members' remedies would be insufficient to make Plaintiff Calise and the other Illinois Class members whole.

325.   Finally, because of Volkswagen's breach of warranties as set forth herein, Plaintiff Calise and the other Illinois Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Calise and the other Illinois Class members of the full purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed.

326.   Volkswagen has been provided notice of these issues by numerous Class members, and VWAG's top executives have been on notice of these problems since August 2016 when VW Germany conducted an internal audit and identified the Pre-Production Cars that have been improperly sold.

327.   As a direct and proximate result of Volkswagen's breach of express warranties, Plaintiff Calise and the other Illinois Class members have been damaged in an amount to be determined at trial.

## NEW JERSEY

## COUNT I
### Violations of New Jersey Consumer Fraud Act
### (N.J. Stat. Ann. §§ 56:8-1, *et seq.*)

328.    Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

329.    Plaintiff Glover brings this action on behalf of himself and the New Jersey Class against all Defendants.

330.    Plaintiff Glover and the New Jersey Class members and Defendants are persons within the meaning of the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

331.    Volkswagen engaged in "sales" of "merchandise" within the meaning of N.J. Stat.  §56:8-1(c), (e). Volkswagen's actions as set forth herein occurred in the conduct of trade or commerce.

332.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. § 56:8-2.

333.    In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the concerning the Class Vehicles. Defendants accomplished this by falsifying the mileage when making application for the

original title, failing to disclose the true use history of the Class Vehicles including whether the Class Vehicles were Pre-Production Cars or whether the Class Vehicles were used as part of the Press Fleet or the Pool Fleet.  The Defendants also presented the Carfax Report in a misleading way by falsely portraying Carfax as independent from Volkswagen without disclosing the true relationship, and by failing to disclose that crucial information contained within the Carfax Report was not obtained independently, but instead came directly from Volkswagen.  The Carfax Report was further misleading by labeling the Class Vehicles as "1-Owner" vehicles and seeking to charge a premium for that alleged "1-Owner" status even though the Class Vehicles did not qualify as "1-Owner" cars under the definitions set forth in the Carfax Report.  Offering any Class Vehicle for sale as a CPO-designated vehicle was also misleading given that most of the Class Vehicles are Pre-Production Cars (Pre-Series or Zero-Series) that either do not comply with Federal Safety Standards or are otherwise not properly certified as conforming to Federal Safety Standards. Volkswagen's practice of making material modifications to the Class Vehicles after the date of manufacture without keeping track of those modifications and without providing the requisite Alterer's Certification to alert consumers that modifications that were made, is also deceptive.

334.   Volkswagen thus violated the provisions of the New Jersey CFA, at a minimum by: (a) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (b) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (c) advertising the Class Vehicles with the intent not to sell them as advertised; (d) failing to disclose information concerning the Class Vehicles

with the intent to induce consumers to purchase the Class Vehicles; and (e) otherwise engaging in conduct likely to deceive.

335.   Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

336.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff Glover and the New Jersey Class.

337.   Volkswagen knew or should have known that its conduct violated the New Jersey CFA.

338.   Volkswagen owed Plaintiff Glover as well as the other members of the New Jersey Class a duty to disclose the illegality of the Class Vehicles, as well as a duty to promptly disclose potential safety violations relating to the build of the Class Vehicles given that Volkswagen possessed exclusive knowledge that the Class Vehicles not comply with Federal Safety Standards and that the Class Vehicles were not otherwise properly certified in accordance with Federal Safety Standards.  Volkswagen further owed Plaintiff Glover and the New Jersey Class a duty to disclose the truth regarding the mileage history of each Class Vehicle, the use history of each Class Vehicle including whether each Class Vehicle was ever part of the Press Fleet or the Pool Fleet, and to disclose that the Class Vehicles did not qualify for CPO Car status.

339.   Volkswagen's fraudulent acts, misleading statements and deceptive concealment of the true characteristics and use history of the Class Vehicles were material to Plaintiff Glover and to the New Jersey Class.

340.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Glover and the New Jersey Class, about the legality of the Class Vehicles, the use history of the Class Vehicles, the mileage history of

the Class Vehicles,  the "1-Owner" status of the Class Vehicles, and the true value of the Class Vehicles.

341.   Plaintiff Glover and the New Jersey Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiff Glover and the New Jersey Class members who purchased the Class Vehicles would not have purchased them at all and/or— if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiff Glover and the New Jersey Class also suffered diminished value of their vehicles, as well as lost or diminished use.

342.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the New Jersey CFA in the course of Defendants' business.

343.   Defendants' violations present a continuing risk to Plaintiff Glover as well as to the New Jersey Class and to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. To give just one example of this continuing risk, Volkswagen has yet to recall all of the dangerous Class Vehicles and has failed to even acknowledge the great danger to New Jersey motorists, including Plaintiff Glover and the New Jersey Class, that has been and is continuing to be created by the Class Vehicles being driven on the road given that such vehicles were wrongfully certified as complying with Federal Safety Standards.

344.   As a result of the foregoing wrongful conduct of Defendants, Plaintiff Glover and the New Jersey Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order

enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees

under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

## COUNT II
### Breach of the Implied Warranty of Merchantability
### (N.J. Stat. Ann. § 12A:2-314)

345.    Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in

the preceding paragraphs as if fully realleged here.

346.    Plaintiff Glover brings this action on behalf of himself and the New Jersey Class against

all Defendants.

347.    The Defendants are and were at all relevant times "merchants" with respect to motor

vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

348.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S.

12A:2-105(1).

349.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary

purpose for which vehicles are used is implied by law pursuant to N.J.S. 12A:2-314.

350.    The Class Vehicles, when sold and at all times thereafter, were not in merchantable

condition and are not fit for the ordinary purpose for which vehicles are used.  Specifically,

the Class Vehicles are inherently defective in that they either do not comply with Federal

Safety Standards, or the Class Vehicles are not properly certified as complying with

Federal Safety Standards or both.   Even if it could be determined that the Class Vehicles

conform to Federal Safety Standards, the lack of the required certification of such

conformance exists is, in-and-of-itself, a defect that makes the Class Vehicles

unmerchantable and otherwise unfit for their ordinary purpose.  Without the required

certification, Plaintiff Glover and Class Members have no assurance that the Class Vehicles

are safe for use, which could result not only in serious bodily injury or death, but also serious legal problems, including seizure of the Class Vehicles and significant monetary penalties.  Furthermore, without the requisite certification of conformance to Federal Safety Standards, the Class Vehicles cannot be sold by Plaintiffs or the Class because to do so may put the Plaintiffs and Class in serious legal jeopardy.  Similarly, the Class Vehicles cannot be legally driven in light of the absence of the required certification of compliance with Federal Safety Standards, and if one were to take the risk of driving the Class Vehicles, should an accident occur, the discovery that the Class Vehicles were not properly certified as conforming to Federal Safety Standards could void insurance coverage on the Class Vehicles or could create other issues of liability exposure in the event that the accident were to involve any other party.

351. As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, Plaintiff Glover and the other New Jersey Class members have been damaged in an amount to be proven at trial.

**COUNT III**
**Breach of Express Warranty**
**(N.J. Stat. Ann. § 12A:2-313)**

352. Plaintiffs incorporates by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

353. Plaintiff Glover brings this Count on behalf of the New Jersey Class, against all Defendants.

354. The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

355.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1).

356.    For Volkswagen-branded Class Vehicles, VWAG expressly represented and thereby warrantied on the Manufacturer Certificate of Origin ("MCO"), "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL SAFETY BUMPER AND THEFT PROTECTION."  This warranty by VWAG was breached because the build of the Pre-Production Cars differs materially from the build of the Series-Production Cars, and therefore, VWAG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as conforming to Federal Safety Standards. And because VWAG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because VWAG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the MCO by VWAG has been breached.

357.    VWAG also expressly represented and thereby warrantied on each Volkswagen-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." ("Manufacturer's Certification"). This Manufacturer's Certification was given by VWAG on a label that was affixed to the driver's door panel of each Volkswagen-branded Class Vehicle.  VWAG also breached this express warranty because the build of the Pre-Production Cars on the date of manufacture differed materially from the build of the Series-Production Cars, and therefore, VWAG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as the date of their manufacturer to claim that the Class Vehicles conform to Federal Safety Standards.  And

because VWAG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because VWAG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the Manufacturer's Certification made by VWAG has been breached.

358.   For Audi-branded Class Vehicles, Audi AG expressly represented and thereby warrantied on the MCO, "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL SAFETY BUMPER AND THEFT PROTECTION." This warranty by Audi AG was breached because the build of the Pre-Production Cars differs materially from the build of the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as conforming to Federal Safety Standards. And because Audi AG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because Audi AG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the MCO by Audi AG has been breached.

359.   Audi AG also expressly represented and thereby warrantied on each Audi-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." ("Manufacturer's Certification"). This Manufacturer's Certification was given by Audi AG on a label that was affixed to the driver's door panel of each Audi-branded Class Vehicle. Audi also breached this express warranty because the build of the Pre-Production Cars on the date of manufacture differed materially from the build of the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as the date of their manufacturer to

claim that the Class Vehicles conform to Federal Safety Standards. And because Audi AG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because Audi AG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the Manufacturer's Certification made by Audi AG has been breached.

360.    VWGOA made these same express warranties when it offered the Class Vehicles for sale as CPO Cars. A vehicle cannot be a CPO Car if it does not comply with Federal Safety Standards and if certification of that compliance is not made in accordance with applicable law. VWGOA breached its express warranty that the Class Vehicles complied with Federal Safety Standards and that the Class Vehicles were properly certified as conforming to Federal Safety Standards for the same reasons that the express warranties provided by VWAG and Audi AG were breached. In addition, VWGOA further breached this express warranty insofar as VWGOA made modifications to the Class Vehicles after the date of manufacture yet failed to document those modifications as required by law and failed to provide the Alterer's Certification. As a result, the Class Vehicles were legally prohibited from being sold, and certainly should not have been sold with CPO status. Consequently, VWGOA's express warranty that the Class Vehicles were qualified for CPO status was breached.

361.    VWGOA also warrantied, by and through the Carfax Report, that each of the Class Vehicles was a "1-Owner" car at the time that Plaintiff Glover and the New Jersey Class purchased a Class Vehicle. VWGOA breached this express warranty because most of the Class Vehicles were both used and possessed by multiple individuals both within

Volkswagen and outside of Volkswagen, and therefore, would not qualify as a "CARFAX 1-Owner" car as represented.

362.    The Defendants' express warranties described herein formed a basis of the bargain that was reached when Plaintiff Glover and the other New Jersey Class members purchased their Class Vehicles.

363.    Affording Volkswagen a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because: Volkswagen has already admitted that the Recalled Vehicles cannot be fixed and it cannot be determined whether those Recalled Vehicles comply with Federal Safety Standards; Volkswagen refuses to disclose the Pre-Production status of the other Class Vehicles that were not a part of the 252 Recalled Vehicles; and Volkswagen's breach of its warranties set forth in the Carfax Report result from Volkswagen's fraud, which Volkswagen has failed to acknowledge to date.

364.    Many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide an adequate remedy within a reasonable time, and any limitation on Plaintiff Glover's and the other New Jersey Class members' remedies would be insufficient to make Plaintiff Glover and the other New Jersey Class members whole.

365.    Finally, because of Volkswagen's breach of warranties as set forth herein, Plaintiff Glover and the other New Jersey Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Glover and the other

New Jersey Class members of the full purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed.

366.    Volkswagen has been provided notice of these issues by numerous Class members, and VWAG's top executives have been on notice of these problems since August 2016 when VW Germany conducted an internal audit and identified the Pre-Production Cars that have been improperly sold.

367.    As a direct and proximate result of Volkswagen's breach of express warranties, Plaintiff Glover and the other New Jersey Class members have been damaged in an amount to be determined at trial.

## WASHINGTON

### COUNT I
**Violations of the Washington Consumer Protection Act**
**(Wash. Rev. Code Ann. 19.86.101 *et seq.*)**

368.    Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

369.    Plaintiff R. Garcia brings this action on behalf of himself and the Washington Class against all Defendants.

370.    Plaintiff R. Garcia and the Washington Class members and Defendants are persons within the meaning of Wash. Rev. Code § 19.86.010(2).

371.    Volkswagen is engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

372.    The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Wash. Rev. Code § 19.86.020.

373.    In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the concerning the Class Vehicles. Defendants accomplished this by falsifying the mileage when making application for the original title, failing to disclose the true use history of the Class Vehicles including whether the Class Vehicles were Pre-Production Cars or whether the Class Vehicles were used as part of the Press Fleet or the Pool Fleet.  The Defendants also presented the Carfax Report in a misleading way by falsely portraying Carfax as independent from Volkswagen without disclosing the true relationship, and by failing to disclose that crucial information contained within the Carfax Report was not obtained independently, but instead came directly from Volkswagen.  The Carfax Report was further misleading by labeling the Class Vehicles as "1-Owner" vehicles and seeking to charge a premium for that alleged "1-Owner" status even though the Class Vehicles did not qualify as "1-Owner" cars under the definitions set forth in the Carfax Report.  Offering any Class Vehicle for sale as a CPO-designated vehicle was also misleading given that most of the Class Vehicles are Pre-Production Cars (Pre-Series or Zero-Series) that either do not comply with Federal Safety Standards or are otherwise not properly certified as conforming to Federal Safety Standards. Volkswagen's practice of making material modifications to the Class Vehicles after the date of manufacture without keeping track of those modifications and without providing the requisite Alterer's Certification to alert consumers that modifications that were made, is also deceptive.

374.    Volkswagen thus violated the provisions of the Washington CPA, at a minimum by: (a) making direct statements or causing reasonable inferences about the Class Vehicles that had the tendency to mislead; (b)  engaging in advertising concerning the CPO status of the

Class Vehicles even though the Class Vehicles were and are ineligible for such status under Volkswagen own internal rules and under the limitations placed on vehicles that qualify for CPO status as set forth in the Carfax Contract; and (c) failing to make clear and conspicuous disclosures of limitations, disclaimers, qualifications, conditions, exclusions or restrictions of the Class Vehicles.

375.    Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

376.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff R. Garcia and the Washington Class.

377.    Volkswagen knew or should have known that its conduct violated the Washington CPA.

378.    Volkswagen owed Plaintiff R. Garcia as well as the other members of the Washington Class a duty to disclose the illegality of the Class Vehicles, as well as a duty to promptly disclose potential safety violations relating to the build of the Class Vehicles given that Volkswagen possessed exclusive knowledge that the Class Vehicles not comply with Federal Safety Standards and that the Class Vehicles were not otherwise properly certified in accordance with Federal Safety Standards.  Volkswagen further owed Plaintiff R. Garcia and the Washington Class a duty to disclose the truth regarding the mileage history of each Class Vehicle, the use history of each Class Vehicle including whether each Class Vehicle was ever part of the Press Fleet or the Pool Fleet, and to disclose that the Class Vehicles did not qualify for CPO Car status.

379.    Volkswagen's fraudulent acts, misleading statements and deceptive concealment of the true characteristics and use history of the Class Vehicles were material to Plaintiff R. Garcia and the Washington Class.

380.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff R. Garcia and the Washington Class, about the legality of the Class Vehicles, the use history of the Class Vehicles, the mileage history of the Class Vehicles,  the "1-Owner" status of the Class Vehicles, and the true value of the Class Vehicles.

381.    Plaintiff R. Garcia and the Washington Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiff R. Garcia and the Washington Class members who purchased the Class Vehicles would not have purchased them at all and/or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiff R. Garcia and the Washington Class also suffered diminished value of their vehicles, as well as lost or diminished use.

382.    Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Washington CPA in the course of Defendants' business.

383.    Defendants' violations present a continuing risk to Plaintiff R. Garcia and the Washington Class and to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. To give just one example of this continuing risk, Volkswagen has yet to recall all of the dangerous Class Vehicles and has failed to even acknowledge the great danger to Washington motorists, including Plaintiff R. Garcia and the Washington Class, that has been and is continuing to be created by the Class Vehicles being driven on the road given that such vehicles were wrongfully certified as complying with Federal Safety Standards.

384.    As a result of the foregoing wrongful conduct of Defendants, Plaintiff R. Garcia and the Washington Class have been damaged in an amount to be proven at trial. Pursuant to Wash. Rev. Code § 19.86.090, Plaintiff R. Garcia and the Washington Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, attorneys' fees, costs, and any other just and proper relief available under the Washington CPA.

**COUNT II**
**Breach of the Implied Warranty of Merchantability**
**(Wash. Rev. Code § 62A.2-314)**

385.    Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

386.    Plaintiff R. Garcia brings this action on behalf of himself and the Washington Class against all Defendants.

387.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and "sellers" of motor vehicles under § 2.103(a)(4).

388.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code § 62A.2-105(1).

389.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code § 62A.2-314.

390.    The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.  Specifically, the Class Vehicles are inherently defective in that they either do not comply with Federal Safety Standards, or the Class Vehicles are not properly certified as complying with

Federal Safety Standards or both.  Even if it could be determined that the Class Vehicles conform to Federal Safety Standards, the lack of the required certification of such conformance exists is, in-and-of-itself, a defect that makes the Class Vehicles unmerchantable and otherwise unfit for their ordinary purpose.  Without the required certification, Plaintiff R. Garcia and Class Members have no assurance that the Class Vehicles are safe for use, which could result not only in serious bodily injury or death, but also serious legal problems, including seizure of the Class Vehicles and significant monetary penalties.  Furthermore, without the requisite certification of conformance to Federal Safety Standards, the Class Vehicles cannot be sold by Plaintiffs or the Class because to do so may put the Plaintiffs and Class in serious legal jeopardy.  Similarly, the Class Vehicles cannot be legally driven in light of the absence of the required certification of compliance with Federal Safety Standards, and if one were to take the risk of driving the Class Vehicles, should an accident occur, the discovery that the Class Vehicles were not properly certified as conforming to Federal Safety Standards could void insurance coverage on the Class Vehicles or could create other issues of liability exposure in the event that the accident were to involve any other party.

391.   As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, Plaintiff R. Garcia and the other Washington Class members have been damaged in an amount to be proven at trial.

## COUNT III
### Breach of Express Warranty
### (Wash. Rev. Code § 62A.2-313)

392.   Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

393.    Plaintiff R. Garcia brings this action on behalf of himself and the Washington Class against all Defendants.

394.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and "sellers" of motor vehicles under § 2.103(a)(4).

395.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code § 62A.2-105(1).

396.    For Volkswagen-branded Class Vehicles, VWAG expressly represented and thereby warrantied on the Manufacturer Certificate of Origin ("MCO"), "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL SAFETY BUMPER AND THEFT PROTECTION."  This warranty by VWAG was breached because the build of the Pre-Production Cars differs materially from the build of the Series-Production Cars, and therefore, VWAG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as conforming to Federal Safety Standards. And because VWAG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because VWAG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the MCO by VWAG has been breached.

397.    VWAG also expressly represented and thereby warrantied on each Volkswagen-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." ("Manufacturer's Certification"). This Manufacturer's Certification was given by VWAG on a label that was affixed to the driver's door panel of each Volkswagen-branded Class

Vehicle. VWAG also breached this express warranty because the build of the Pre-Production Cars on the date of manufacture differed materially from the build of the Series-Production Cars, and therefore, VWAG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as the date of their manufacturer to claim that the Class Vehicles conform to Federal Safety Standards. And because VWAG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because VWAG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the Manufacturer's Certification made by VWAG has been breached.

398. For Audi-branded Class Vehicles, Audi AG expressly represented and thereby warrantied on the MCO, "THIS VEHICLE CONFORMS WITH APPLICABLE U.S. FEDERAL SAFETY BUMPER AND THEFT PROTECTION." This warranty by Audi AG was breached because the build of the Pre-Production Cars differs materially from the build of the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as conforming to Federal Safety Standards. And because Audi AG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because Audi AG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the MCO by Audi AG has been breached.

399. Audi AG also expressly represented and thereby warrantied on each Audi-branded Class Vehicle, "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." ("Manufacturer's Certification"). This Manufacturer's Certification was given by Audi AG

on a label that was affixed to the driver's door panel of each Audi-branded Class Vehicle. Audi also breached this express warranty because the build of the Pre-Production Cars on the date of manufacture differed materially from the build of the Series-Production Cars, and therefore, Audi AG cannot legally rely upon the certification of the Series-Production Cars to certify the build of the Pre-Production Cars as the date of their manufacturer to claim that the Class Vehicles conform to Federal Safety Standards. And because Audi AG has not separately tested and determined that the Class Vehicles comply with Federal Safety Standards, and because Audi AG has not otherwise provided a legally compliant certification in that regard, the warranty set forth in the Manufacturer's Certification made by Audi AG has been breached.

400.    VWGOA made these same express warranties when it offered the Class Vehicles for sale as CPO Cars. A vehicle cannot be a CPO Car if it does not comply with Federal Safety Standards and if certification of that compliance is not made in accordance with applicable law. VWGOA breached its express warranty that the Class Vehicles complied with Federal Safety Standards and that the Class Vehicles were properly certified as conforming to Federal Safety Standards for the same reasons that the express warranties provided by VWAG and Audi AG were breached. In addition, VWGOA further breached this express warranty insofar as VWGOA made modifications to the Class Vehicles after the date of manufacture yet failed to document those modifications as required by law and failed to provide the Alterer's Certification. As a result, the Class Vehicles were legally prohibited from being sold, and certainly should not have been sold with CPO status. Consequently, VWGOA's express warranty that the Class Vehicles were qualified for CPO status was breached.

401.   VWGOA also warrantied, by and through the Carfax Report, that each of the Class Vehicles was a "1-Owner" car at the time that Plaintiff R. Garcia and the Washington Class purchased a Class Vehicle.  VWGOA breached this express warranty because most of the Class Vehicles were both used and possessed by multiple individuals both within Volkswagen and outside of Volkswagen, and therefore, would not qualify as a "CARFAX 1-Owner" car as represented.

402.   The Defendants' express warranties described herein formed a basis of the bargain that was reached when Plaintiff R. Garcia and the other Washington Class members purchased their Class Vehicles.

403.   Affording Volkswagen a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because: Volkswagen has already admitted that the Recalled Vehicles cannot be fixed and it cannot be determined whether those Recalled Vehicles comply with Federal Safety Standards; Volkswagen refuses to disclose the Pre-Production status of the other Class Vehicles that were not a part of the 252 Recalled Vehicles; and Volkswagen's breach of its warranties set forth in the Carfax Report result from Volkswagen's fraud, which Volkswagen has failed to acknowledge to date.

404.   Many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide an adequate remedy within a reasonable time, and any limitation on Plaintiff R. Garcia's and the other Washington Class members' remedies would be insufficient to make Plaintiff R. Garcia and the other Washington Class members whole.

405. Finally, because of Volkswagen's breach of warranties as set forth herein, Plaintiff R. Garcia and the other Washington Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff R. Garcia and the other Washington Class members of the full purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed.

406. Volkswagen has been provided notice of these issues by numerous Class members, and VWAG's top executives have been on notice of these problems since August 2016 when VW Germany conducted an internal audit and identified the Pre-Production Cars that have been improperly sold.

407. As a direct and proximate result of Volkswagen's breach of express warranties, Plaintiff R. Garcia and the other Washington Class members have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Classes, respectfully request that the Court grant certification of the proposed Nationwide Class and State Classes, including the designation of Plaintiffs as the named representatives of the Nationwide Class and respective State Classes, the appointment of the undersigned as Class Counsel, and the designation of any appropriate subclasses, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in their favor and against Defendants, as follows:

A. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged in this Complaint;

B.      Injunctive and equitable relief in the form of a comprehensive program to repair, retrofit, and/or buyback all Class Vehicles, and to fully reimburse and make whole all Class members for all costs and economic losses;

C.      A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

D.      Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, and disgorgement, in an amount to be determined at trial;

E.      Rescission of all Class Vehicle purchases, including reimbursement and/or compensation of the full purchase price of all Class Vehicles, including taxes, licenses, extended warranties, GAP insurance and other fees.

F.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded.

G.      An award of costs and attorneys' fees, as allowed by law;

H.      Leave to amend this Complaint to conform to the evidence produced at trial; and

I.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

## DAMAGES STATEMENT

No portion of any amount of damages sought herein against any Defendant is required to be shared, in whole or in part, with any governmental entity under applicable law. No portion of the damages sought herein is for any civil penalty under applicable law.

Dated:  May 31, 2019

Respectfully submitted,

THE LAW OFFICES OF MICHAEL J.
MELKESEN, P.C.

By:      /s/ *Michael J. Melkersen*
       Michael J. Melkersen

Michael Melkersen
The Law Offices of Michael J. Melkersen, P.C.
9633 S. Congress Street
New Market, Virginia 22844
Telephone: 540.740.3937
Facsimile:  540.740.8851
E-mail: mike@mlawpc.com

MOTLEY RICE LLC

Nathan D. Finch
Kevin R. Dean *(Admitted Pro Hac Vice)*
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Telephone: 843.216.9000
Facsimile:  843.216.9440
nfinch@motleyrice.com
kdean@motleyrice.com

*Attorneys for the Plaintiffs and for the
Proposed Nationwide Class and State Classes*